FILED

# UNITED STATES DISTRICT COURT SEP -9 PM 1:17

## For the

CLERK U S DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA

## MIDDLE DISTRICT OF FLORIDA

## TAMPA DIVISION

| | |
|---|---|
| Stephen Joseph Madigan, as Personal Representative for the Estate of Eugene J. Madigan, Deceased, and as Agent for Mildred A. Madigan )<br><br>Plaintiff )<br><br>v. )<br><br>Robert Richard Lucci, )<br>Barbara Jane Knox, )<br>Margaret Rucker Hixon a/k/a Margaret Rucker, )<br>Blair M. Larsen, )<br>Prudential Annuities Life Assurance Corp., )<br>Allianz Life Insurance Corp. of North America, and )<br>American Equity Investment Life Insurance Company. )<br><br>Defendants ) | Civil Action No. _____<br><br>8:14 CV2242 T 33 AEP |

**COMPLAINT** is for violations of §§772.103(3), (4); 517.301; 817.29; 415.1111 Fla.

Stat. and common law fraud and

## DEMAND FOR JURY TRIAL

Said **COMPLAINT** filed pro se by Plaintiff, Stephen J. Madigan, as Personal

Representative for the Estate of Eugene J. Madigan, Deceased, (Letters of

Administration are attached and form part of this Complaint) and as Agent for

Mildred A. Madigan, alleges as follows:

TPA-25535
$400

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

## NATURE OF ACTION

1. This action arises from schemes employed, misrepresentations of material facts made and omissions to state material facts necessary to make the statements made not misleading and transactions and practices engaged by at least one Defendant either separately or in participation with, including conspiratorially, other Defendants with the intention to fraudulently induce Mr. Madigan and Mrs. Madigan ("Madigans") to relinquish property, thereby, profiting at Madigans' expense.

2. Robert R. Lucci ("Lucci"), Margaret Rucker Hixon a/k/a Margaret Rucker ("Rucker"), Barbara J. Knox ("Knox") and Blair Larsen ("Larsen") all Defendants and Jonna D. Keller ("Keller") while associated with or employed by brokerage firms, insurance agencies or an insurance company as agents, brokers or employees solicited, arranged and sold and acquired securities, including variable life insurance products, and fixed and indexed annuities issued by a Prudential Annuities Life Assurance Corporation formerly named American Skandia Life Assurance Corporation ("Prudential"), Allianz Life Insurance Co. of North America ("Allianz") and American Equity Investment Life Insurance Co. ("American Equity") all Defendants and Bankers Life & Casualty Co. ("Bankers Life") to Madigans. Plaintiff alleges Defendants Lucci, Rucker and Knox exhorted money from Madigans using deceit to convince them on two separate occasions to invest monies in a worthless investment.

3. It is alleged that Lucci, Knox and Prudential all Defendants each participated directly or indirectly in the conduct of the affairs of an enterprise through a pattern of

2

USDC Middle District of Florida Tampa Division                     Plaintiff v. Lucci, et al.

criminal activity in violation of Chapter 772, Civil Remedies for Criminal Practices,

§772.103(3) Fla. Stat. Chapter 772 contains Florida's civil RICO statutes. The

criminal activity forming any pattern violated §517.301 and/or §817.29 Fla. Stat.

4. It is alleged that Lucci, Rucker, Knox and Prudential all Defendants in violation

of §772.103(4) Fla. Stat. conspired to violate §772.103(3) Fla. Stat. These persons

agreed either to participate, directly or indirectly, in the conduct of the enterprise with

the knowledge and intent that at least one other member, including itself, would

commit or participate in the commission of two predicate acts in furtherance of the

enterprise or to facilitate a scheme that would, if completed, constitute a substantive

violation of §772.103(3) involving at least one other conspirator who would

participate in the affairs of the enterprise.

5. The criminal activity comprises elements of common law and/or statutory

fraud. Because the wrongful conduct involves the commissions of common law fraud

and/or violations of §817.29 Fla. Stat. Plaintiff will pursue actions independent of

Florida's civil RICO statutes.

6. Defendants Larsen, Allianz and American Equity are not defendants in the

RICO actions. Defendant Larsen is alleged to have participated in the commission of

a common law fraud. Under agency principles, including respondeat superior, Allianz

and American Equity each is alleged to be liable for the wrongful actions of its

employees or agents acting within the course of his or her employment or scope of

his or her authority.

3

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

7. Defendants Lucci, Knox and Prudential each occupying a fiduciary relationship with respect to Madigans is alleged to have exploited them for their own personal gain in violation of §415.1111 Fla. Stat. Under agency principles, including respondeat superior, Defendant Prudential alleged to be liable for the wrongful actions of its agents Lucci and Rucker.

8. As a consequence of Defendants wrongful conduct Madigans incurred losses of more than $755,000, excluding non-economic losses. The Plaintiff now seeks relief, including treble damages and other actual or compensatory and punitive damages, along with the Plaintiffs' costs in investigating and prosecuting this action.

9. Exhibit 2 titled, "Plaintiff's Civil RICO Case Statement," is attached to and part of this Complaint.

## PARTIES

10. Plaintiff is the personal representative for the Estate of Eugene J. Madigan, Deceased, and Agent for Mildred A. Madigan and a resident of Manatee County Florida.

11. Lucci is an individual having been licensed as a broker but not currently registered with FINRA and currently licensed as an insurance agent by Florida and appointed by insurance carriers. Lucci resides in or near Sarasota, Florida.

12. Rucker is an individual having been licensed as a broker but not currently registered with FINRA and currently licensed as an insurance agent by Florida and appointed by insurance carriers. Rucker resides in or near Sarasota, Florida.

4

USDC Middle District of Florida Tampa Division            Plaintiff v. Lucci, et al.

13. Knox is an individual having been licensed as broker and investment advisor not currently registered with FINRA. Knox resides in or near Sarasota, Florida.

14. Larsen is an individual licensed as an insurance agent by Florida. Larsen resides in or near Sarasota, Florida.

15. Prudential sells variable insurance products, including variable life insurance policies and variable annuities, fixed annuities and indexed annuities. Its address is Prudential Annuities Life Assurance Corporation, One Corporate Drive, Shelton, CT 06484. American Skandia Life Assurance Corporation issued the variable insurance products acquired by Madigans. After being acquired its name was changed to Prudential Annuities Life Assurance Corporation.

16. Allianz sells variable insurance products, including variable life insurance policies and variable annuities, fixed annuities and indexed annuities. Its principle place of business is 5701 Golden Hills Drive, Minneapolis, MN 55416-1297.

17. American Equity sells variable insurance products, including variable life insurance policies and variable annuities, fixed annuities and indexed annuities. Its address is 6000 Westown Parkway, Suite 300, West Des Moines, IA 50266.

**JURISDICTION AND VENUE**

18. This Court's jurisdiction is based upon 28 U.S.C. §1332 and applicable principles of supplemental jurisdiction under 28 U.S.C. §1367(a).

19. Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b) and (d). Individual defendants are residents of Florida. A substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

USDC Middle District of Florida Tampa Division        Plaintiff v. Lucci, et al.

## FACTUAL BASIS OF CLAIMS

### Statute of Limitations

20. The statute of limitations for Florida civil RICO cases is set forth in §772.17. "Notwithstanding any other provision of law, a civil action or proceeding under the chapter may be commenced at any time within 5 years after the conduct in violation of a provision of this act terminates or the cause of action accrues." Florida follows the "last predicate act" rule.

21. The last predicate act rule requires that a defendant engage in a pattern of criminal activity comprising at least two incidents of criminal activity the last of which occurred within 5 years after a prior incident of criminal activity. Once the pattern is established Madigans can recover for all harm caused by all the acts that make up the complete pattern.

22. Recently the U.S.D.C. for the Southern District of Florida, Miami Division was asked whether the injury discovery rule (adopted by the federal courts) or the last predicate act rule (Florida statutory law) applied in a Florida civil RICO case. Consejo de Defensa del Estado de la Republica de Chile v. The PNC Financial Services Group, Inc., Case No. 09-20612. The defendant argued for the last predicate act rule. The Court, on summary judgment, found for the Defendant. The rationale for its decision is unreported. As the rule to be applied would be determinative of the outcome, Federal courts are required to apply state law . Nine other states that have enacted civil RICO statutes apply the last predicate act rule.

6

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

## Madigans' Financial Position Leading Up To Misconduct

23. Eugene J. Madigan was born 1/3/23. Mildred A. Madigan was born 9/14/24. Madigans were married in 1946. Mr. Madigan was employed as an engineer by Ford Motor Company from 1953 through 1985 when he retired. Upon his retirement Madigans moved to Florida living together at 8814 Timber Lake Lane, Sarasota, Florida, until Mr. Madigan died 4/18/2013. Since Mr. Madigan's death, Mrs. Madigan has continued to reside at 8114 Timber Lake Lane. Mr. Madigan suffered from diabetes throughout the period defined by the predicate acts and incurred a debilitating stroke in the summer of 2010. Beginning in 2004 Mrs. Madigan experienced physical abnormalities, including loss of balance affecting her gait, attributable to cerebral dysfunctions. Sometime thereafter she diagnosed with Alzheimer's disease.

24. Mr. Madigan received the following Ford Motor Company retirement benefits: a monthly pension which was received until his death; an accrued benefit in a thrift saving plan; health benefits; and life insurance benefits. Madigans received social security benefits. Small amounts of investment income earned with respect to bank deposits, including certificates of deposit, and funds maintained by brokerage firms were received in the years following retirement.

25. Madigans' annual gross income from the sources mentioned in the above paragraph approximated $40,000 in 1999. However, throughout the period 1985 through 2013, Madigans' annual living expenses exceeded $60,000. Prior to 2000 Madigans satisfied   the shortfall using funds stationed in their bank or brokerage

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

account without the necessity of paying excessive fees. In years 1997 through 2002, Mrs. Madigan received approximately $625,000, including interest, from the sale of her inherited interest in the family farm. Monies received prior to 2000 were primarily invested in mutual funds with Salomon Smith Barney ("SSB") and a lesser amount deposited in the bank. In 2007, Mr. Madigan received an inheritance of approximately $60,000 from the estate of his uncle.

26. As of the end of 1999, Madigans owned the following liquid and non-liquid assets, excluding their residence, approximating $600,000.

- two variable annuity contracts, an annuity issued by GE Life & Annuity Assurance Co. ("GE Life"), acquired in 1994 by means of a 1035 exchange and an annuity issued by The Travelers Life & Annuity Co. ("Travelers"), acquired in 1998 by means of a 1035 exchange. The total value of these annuities was $201,662.56.

- mutual fund investments totaling approximately $136,000 and a money market account of less than $1,000 maintained by SSB.

- $24,500 held by National Financial Services Corp., the clearing unit for American General Securities, Inc. ("AGS"),  having been transferred to it by SSB in anticipation of the acquisition of Prudential variable insurance products.

- IRA account owned by Mr. Madigan with an approximate value of $100,000 maintained by SSB and invested in mutual funds.

- IRA account by Mrs. Madigan with an approximate value of $4,500 maintained by SSB and invested in mutual funds.

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

- flexible premium variable life insurance policy #040242128 on the life of Mr. Madigan issued by The Equitable Life Assurance Society of the U.S. ("The Equitable"), face value of $75,000, with an account balance of $40,538.47.

- $5,000 life insurance policy on the life of Mrs. Madigan issued by First Allmerica Life Assurance Co. #0176275900.

- bank deposits of less than $100,000.

### Factual Basis of Misconduct

27. Plaintiff alleges that Defendants Lucci, Rucker, Knox and Prudential violated Florida's civil RICO statute. These Defendants were members of and associated with an association-in-fact enterprise. These Defendants either conducted or participated in the conduct, directly or indirectly, of the affairs of the enterprise through a pattern of criminal activity in violation of §772.103(3) Fla. Stat. or conspired to violate §772.103(3) in violation of §772.103(4). The misconduct of these defendants injured Madigans in their property.

28. Plaintiff alleges certain acts committed by Defendants may also be prosecuted as common law fraud, as a violation of statutory fraud under §817.29 and/or exploitation of a vulnerable adult under §415.1111 although the acts may be predicate acts.

29. Plaintiff alleges that certain Defendants are liable for damages the result of acts committed by another Defendant under agency principles, including respondeat superior.

USDC Middle District of Florida Tampa Division        Plaintiff v. Lucci, et al.

### Predicate Act 1

30. On 2/7/2000 Prudential issued a variable life insurance policy VL3000495 ("PVL Policy") on the life of Mr. Madigan, then 77 years of age, face value of $100,000, as a replacement for a variable life insurance policy #040242128 issued on the life of Mr. Madigan by The Equitable, face value of $75,000. Mrs. Madigan was the owner of each policy. The premium paid for the PVL Policy was $40,538.47 rolled over from the replaced policy. After deducting a state insurance tax of $1,175.61, $39,362.86 remained to be invested in Prudential sub-accounts that varied with investment performance. Madigans incurred a loss of more than $78,000 calculated under §517.211 Fla. Stat. Lucci and Rucker solicited the replacement. Rucker signed as agent. Rucker was licensed as an agent by Florida and appointed by Prudential. The acquisition is alleged to have violated §517.301 Fla. Stat.

### Misconduct - Predicate Act 1

31. The application for PVL Policy provided the following information. Mr. Madigan was 77 years old. Madigans' net income was $50,000 per annum. Madigans' net worth was $600,000. The application attached to the contract failed to provide for allocations. Unless a signed document is produced, allocations were made without the approval of Madigans.

32. On 3/16/2000 an employee of Prudential employee faxed Rucker a blank investment allocation form to be used to provide for allocations to the sub-accounts. Rucker and Mrs. Madigan signed the form. Rucker falsified the form dating it 2/29/2000. The signed form does not indicate whether it applies to PVL Policy or

10

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

annuities issued prior to 3/16/2000. If Rucker had wanted the form to apply to PVL

Policy she would have dated it prior to 2/7/2000. It is likely allocations were made by

Rucker at the time the policy issued.

33. The replacement was unsuitable to Madigans' needs. Mr. Madigan was 77

years of age, had a short time horizon and had low risk tolerance having little

investment experience. Any precipitous market decline would leave little time to

recover. Notwithstanding Lucci and Rucker recommended that the funds be invested

in Prudential sub-accounts the values of which varied with investment performance

even though The Equitable policy had been invested at a fixed rate. Each sub-

account in which Lucci and Rucker advised Madigans to invest contained equities

that were highly speculative.

34. The Equitable policy had a specified amount of $75,000. The specified amount

is the amount Mrs. Madigan would receive upon Mr. Madigan's death. The policy

was level meaning the account value would inure to benefit of The Equitable upon

Mr. Madigan's death. The account value grew at a compounded ROI of 6%. At the

time of the exchange the account value was $40,538.47. Actuarially a 6% ROI on

$40,538.47 would result in the account value reaching its goal of $75,000 by a pre-

determined date. The Equitable policy was accomplishing its goal.

35. Lucci and Rucker recommended that Madigans replace a policy that was

performing for the PVL Policy that could only reach its goal of $100,000 by a pre-

determined date if the ROI was 12% but not 6%. (The application is devoid of any

discussion that a ROI of 12% is necessary.) At inception an additional cash infusion

11

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

would have been required had the ROI remained at 6%. Without the cash infusion

the amount available to invest   $39,362.86 would have to be invested in sub-

accounts the value of which varied with investment performance. A decline below

$39,362.86 would have required monthly insurance and tax costs to be borne by the

original investment. An additional increase in the ROI would be required.

36. If Lucci or Rucker had acted quickly a total loss may have been avoided. The

investment may have been reallocated to a fixed rate sub-account and/or the

specified amount could have reduced saving insurance and tax costs. They did

nothing. In late 2004 Rucker moved the remaining investment of some $5,000 into a

conservative asset fund. In late 2005 she moved 75% of what remained out of the

asset fund into a bond fund paying 3.50%. It would have taken a ROI of 120% just to

pay the monthly insurance and tax costs.

37. The replacement of The Equitable policy was unnecessary. Lucci and Rucker

could have recommended that The Equitable increase the specified amount to

$100,000. However, The Equitable would have required a cash infusion as the policy

was level. Such a recommendation would not be forthcoming as Lucci and Rucker

would not have received a sales commission.

38. In addition to receiving the sales commission Lucci and Rucker intended to

benefit in other ways. First, by investing in sub-accounts that varied with market

performance, they anticipated that the equity markets would continue upward

increasing the account value and, thereby sharing in the growth through trailing

commissions.

12

39. Second, as a result of the exchange Lucci and Rucker would receive insurance commissions. The account value is assessed an insurance charge based upon the spread between specified amount and the account value. By raising the specified amount from $75,000 to $100,000, monthly life insurance costs and concomitant commissions increase by 33 1/3%. If the account value falls, insurance premiums   increase. Reducing the specified amount would have reduced their commissions. Refer to predicate acts 6 and 7.

40. A FINRA check revealed that Lucci was placed on probation by the Florida Department of Insurance for the period 9/25/1999 through 9/25/2000. While on probation, Lucci was prohibited from performing agent activities that required a license issued by the Florida Department of Insurance. Client solicitation or participation in a sale of a variable life product is an activity for which a license is required. The information section was filled out by Lucci as the printing matches that shown on other Lucci documents.

41. Rucker was an agent for Prudential acting within the scope of her authority. Under agency principles, including respondeat superior, Prudential is liable for her actions whether her authority was express, implied or apparent inasmuch as it ratified the actions and accepted the benefits. Although Rucker's actions were fraudulent being wanton and willful, Prudential would be liable as it knowingly ratified her actions and accepted the benefits.

13

USDC Middle District of Florida Tampa Division               Plaintiff v. Lucci, et al.

Predicate Acts 2 - 5

42. In 2000 Madigans acquired four variable annuities from Prudential. With respect to the first two annuities acquired, the applications attached to the contracts show that Rucker signed as the agent. Rucker was licensed in Florida and appointed by Prudential. Applications for the two other acquisitions were not attached to the contracts. Plaintiff has been informed by Prudential that the applications are unavailable. It is assumed that Rucker was the agent with respect to those contracts. Lucci, after his appointment, and Rucker were listed as agents of record by Prudential. Lucci and Rucker solicited the four sales. Keller participated in the last three sales.

43. Each of the acquisitions was unsuitable to the needs of Madigans. Each of the acquisitions was solicited by Lucci while he was serving a one year probation imposed by the Florida Department of Insurance. The first two acquisitions were approved by Prudential employees although the applications were incomplete. The last two acquisitions were approved by Prudential employees although applications were not submitted. Each of the acquisitions involved the failure of Prudential to properly supervise its employees and agents. Each of the contracts for the four annuity acquisitions contained language that operated to discriminate against Madigans based on their ages.  Prudential was aware at the times of issuance of each annuity that its sub-accounts were being manipulated by means of a widespread market timing scheme.

14

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

44. To avoid duplication, following predicate act 5 the misconduct applicable to predicate acts 2 – 5 is disclosed. Each acquisition is alleged to have violated §517.301 Fla. Stat.

Predicate Act 2

45. On 2/24/2000 Prudential issued non-qualified deferred variable annuity #000413125 ("PNQ Annuity 2") to Mr. Madigan, the annuitant and owner then 77 years of age, in a 1035 exchange for two variable annuities, a first #T06020013 issued by GE Life, acquired in 1994 by means of a 1035 exchange and a second #9281886 issued by Travelers, acquired in 1998 by means of a 1035 exchange. The consideration paid for PNQ Annuity 2 was $196,128.81, the total value of the exchanged variable annuity contracts after surrender charges and other fees of $5,533.75 were deducted. The consideration was invested in Prudential sub-accounts that varied with investment performance. Madigans incurred a loss of more than $222,000 calculated under §517.211 Fla. Stat. Rucker signed as agent for High Mark Insurance & Financial Services of Sarasota County, Inc. ("High Mark Financial"). She was registered as a broker for Tower Equities, Inc. ("Tower Equities"). Prudential listed Lucci, following his appointment, and Rucker as agents of record.

Predicate Act 3

46. On 3/2/2000 Prudential issued non-qualified deferred variable annuity #000421087 ("PNQ Annuity 3") to Mr. Madigan, the annuitant then 77 years of age and an owner with Mrs. Madigan, for a cash consideration of $210,646.86, after

15

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

paying commissions of $2,633.92 in the liquidation of mutual funds used as sources

for the consideration. The account value was invested in Prudential sub-accounts

that varied with investment performance. Madigans incurred a loss of more than

$237,000 calculated under §517.211 Fla. Stat. Rucker signed as agent for High

Mark Financial. She was registered as a broker for Tower Equities. Prudential listed

Lucci, after his appointment, and Rucker as agents of record. A portion of the funds

used to purchase PNQ Annuity 3 was held in an account at AGS where Keller was

the account executive.

Predicate 4

   47. On 6/22/2000 Prudential issued qualified deferred variable annuity

#000424126 ("PQ Annuity 4") to Mr. Madigan, the annuitant and owner then 77

years of age, for a cash consideration of $102,470.31. The PQ Annuity 4 is an IRA

under §408(b) of the IRC. The consideration was transferred directly from an IRA

created in January 2000 and maintained by AGS. AGS received the IRA funds in a

direct transfer from an IRA maintained by SSB since 1991. The consideration was

invested in Prudential sub-accounts that varied with investment performance. The

funds used to purchase PQ Annuity 4 were held at AGS. Madigans incurred a loss of

more than $100,000 calculated under §517.211 Fla. Stat. The application is

unavailable but it is assumed that Rucker was the agent. Rucker was registered as a

broker for Tower Equities. Keller also had an appointment with Prudential. Keller had

been Madigans' account executive at AGS. After his appointment, Lucci along with

Rucker were listed as agents of record by Prudential.

16

USDC Middle District of Florida Tampa Division            Plaintiff v. Lucci, et al.

### Predicate Act 5

48. On 10/9/2000 Prudential issued qualified deferred variable annuity #000424486 ("PQ Annuity 5") to Mrs. Madigan, the annuitant and owner then 76 years of age, for a cash consideration of $4,517.03. The PQ Annuity 5 is an IRA under §408(b) of the IRC. The consideration was transferred directly from an IRA created in January 2000 and maintained by AGS. AGS received the IRA funds in a direct transfer from an IRA maintained by SSB since 1991. The consideration was invested in Prudential sub-accounts that varied with investment performance. The funds used to purchase PQ Annuity 5 were held at AGS. Madigans incurred a loss of more than $4,300 calculated under §517.211 Fla. Stat. The application is unavailable but it is assumed that Rucker was the agent. Rucker was registered as a broker for Tower Equities. Keller also had an appointment with Prudential. Keller had been Madigans' account executive. After his appointment, Lucci along with Rucker were listed as agents of record by Prudential.

### Misconduct - Predicate Acts 2 - 5

49. Suitability - Each of the sales was unsuitable to the needs of Madigans. Mr. Madigan was 77 years old. As stated on the application for the PVL Policy, Madigans' net income was $50,000 per annum. The same application stated that their net worth was $600,000.  Madigans had low risk tolerance having little investment experience. They had a short investment time horizon. Given their ages as any precipitous market decline would leave little time to recover. Because

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, *et al.*

Madigans were a low income tax bracket investments providing tax deferral would be of little benefit.

   50. Madigans' annual income was fixed. They received approximately $40,000 in years 1999 through 2013, excluding monies Mrs. Madigan received in 1998 through 2002 from the sale of her interest in an inherited farm and a small amount of money Mr. Madigan received in 2007 from an inheritance. However, throughout the period 1985 through 2013, Madigans' annual living expenses exceeded $40,000. Prior to 2000 Madigans withdrew monies to meet the shortfall from sufficient funds stationed in their bank or brokerage account without the necessity of paying excessive fees. They were liquid. In years after 1999 Madigans experienced difficulty meeting the shortfall without incurring excessive fees. They were now illiquid.

   51. The consideration paid for the Prudential variable insurance products in 2000 represented 92% of their liquid and non-liquid assets, excluding their residence. After the acquisition of PNQ Annuity 3, over 75% of Madigans' declared net worth, exclusive of their residence, was invested in Prudential variable insurance products. After the acquisition of PQ Annuity 4, over 90% of Madigans' declared net worth was so invested. After the acquisition of PQ Annuity 5, over 92% of Madigans' declared net worth was so invested. Later Madigans found it necessary to withdraw funds from these annuities and liquidate their investments in remaining mutual funds held in accounts managed by Lucci and Rucker. The cost to access these sources was often excessive.

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

52. In years prior to 2000 SSB had invested the Madigans' money conservatively primarily in governmental funds. Madigans owned two non-qualified deferred annuities which had performed very well representing 25% of their net worth, excluding their Sarasota residence.

53. Notwithstanding Madigans' ages, lack of investment experience and short investment time horizon, Lucci and Rucker recommended that all of the funds be invested in Prudential sub-accounts that varied with market performance. Each sub-account in which Lucci and Rucker advised Madigans to invest contained equities that were highly speculative. For the most part Lucci and Rucker recommended the same investment profile for each variable insurance product.

54. Specifically with respect to Predicate act 2, the exchange was unsuitable to Madigans' needs. The account values comprising the two variable annuities replaced by PNQ Annuity 2 were invested in sub-accounts that varied with market performance. The account value comprising PNQ Annuity 2 was invested in sub-accounts that varied with market performance although more risky. As a result of the exchange Madigans were subject to a new surrender period that would end 2/1/2008. Madigans incurred surrender charges and other fees of $5,533.75. Surrender charges of $3,775.20 attributable to the surrender of the GE Life annuity could have been avoided if the exchange had occurred on or after 5/5/2000. There is no document comparing the annuities involved in the exchange, i. e., new surrender period and costs to surrender the exchanged annuities.

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

55. With respect to predicate acts 4 and 5, Madigans, by transferring funds maintained in a §408(a) IRA to a §408(b) IRA, receive no more tax deferral benefits than they would have received had the funds remained in the §408(a) IRA. Additionally Prudential may impose surrender charges with respect to a partial withdrawal that exceeds the amount required to be distributed in any year ("required minimum distribution"). At their ages an IRA is intended to be a source of income subject to income tax but free of other impediments such as surrender charges.

56. There is no written document available setting forth how Lucci, Rucker or Keller determined that the variable annuities recommended and acquired were suitable for Madigans' needs.

57. Probation - A FINRA check reveals that Lucci was placed on probation by the Florida Department of Insurance for the period 9/25/1999 through 9/25/2000. The case number is 20439-97-A. The case was initiated 9/3/97. It was determined that he misrepresented the terms and conditions of the sale of a flexible premium variable life insurance product resulting in extreme losses to the complainant.

58. While on probation, Lucci was prohibited from performing agent activities that required a license issued by the Florida Department of Insurance. Client solicitation or participation in a sale of a variable life product is an activity for which a license is required.

59. The following disclosures confirm that Lucci participated in the solicitation and sales of variable insurance products to Madigans while on probation.

20

USDC Middle District of Florida Tampa Division     Plaintiff v. Lucci, et al.

60. At the time of the solicitation and/or sale of each variable insurance product, Lucci was President of High Mark Financial with an address of 3212 Gulf Gate Drive, Sarasota, Florida, the insurance agency for which Rucker signed as agent.

61. Lucci signed a receipt dated 12/23/1999 for monies withdrawn from Madigans' Templeton Franklin Money Market Fund in the amount of $77,586.16 used in part to purchase PNQ Annuity 3.

62. Lucci signed a second receipt dated 3/15/200 for the proceeds realized from the sale of shares in Fidelity Adv. Growth Opportunity Class B in the amount of $22,651.33 used in part to purchase PNQ Annuity 3. The receipt dated 3/15/2000 is on High Mark Financial letterhead with an address of 3212-B Gulf Gate Drive, Sarasota, Florida.

63. Lucci filled out the Madigans' information section on the attached applications (printing matches that on other documents). The applications were signed by Rucker. A FINRA check reveals that Rucker performed similar acts in May 2000, while registered with Tower Equities, signing as agent on the sale of an unsuitable variable annuity solicited by Lucci, a violation of §517.301 Fla. Stat.

64. Lucci was questioned by Mrs. Madigan regarding deferred sales charges incurred when interests in two mutual funds were liquidated in order to provide funds used to purchase PNQ Annuity 3. On 2/29/2000 a deferred sales charge of $2,016.20 was incurred upon the sale of Enterprise Growth Class B Fund. Lucci, who was on probation at the time, in a note written to Mrs. Madigan stated that the deferred sales charge would be offset by a Prudential credit of $2,818.52 (4% x

21

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

$70,463.31). He added in the note, "So you will make money by transferring." At the time of the sale Keller was the account executive at AGS.

65. On 3/8/2000 a deferred sales charge of $599.72 was incurred upon the sale of Fidelity Adv. Growth Opportunity Class B Fund. Lucci gave a similar explanation in a note to Mrs. Madigan when he wrote that the deferred sales charge would be offset by a Prudential credit of $930.04 (4% x $23,251.05). At the time of the sale Keller was the account executive at AGS.

66. On 6/22/2000, after Lucci's probation ended, Mr. Madigan acquired PQ Annuity 4 for a consideration of $102,470.31. The consideration was directly transferred to Prudential from a §408(a) IRA established at AGS in January 2000. At the time of the creation and funding of the AGS IRA, Defendant was serving probation.  Keller was listed as the AGS account executive through March. A FINRA check reveals that Keller was first registered with AGS September 1999 and left at the end of January 2000 when she immediately registered with Tower Equities joining Lucci and Rucker. It is unknown who authorized the transfer from the AGS IRA to Prudential. No application is attached to the contract.

67. On 10/9/2000, after Lucci's probation ended, Mrs. Madigan PQ Annuity 5 acquired for a consideration of $4,517.03. The consideration was directly transferred to Prudential from a §408(a) IRA established at AGS in January of 2000. At the time of the creation and funding of the AGS IRA, Defendant was serving probation. Keller was listed as the AGS account executive through March. A FINRA check reveals that Keller was first registered with AGS September 1999 and left at the end of

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

January 2000 when she immediately registered with Tower Equities joining Lucci
and Rucker.

68. A document, titled Authorization to Initiate Trustee to Trustee Transfers of
Certain Qualified Assets ("Authorization"), was signed on 7/6/2000 by Margaret
Rucker and Mildred A. Madigan. The signature of Mrs. Madigan appears to be a
forgery. Lucci attached the Authorization to a memo dated 7/6/2000 prepared on
High Mark Financial letterhead which he signed and faxed to Prudential's southeast
team.

69. The discovery process may reveal other communications, written and oral,
that occurred between Lucci and Prudential employees while on probation or after
probation.

70. Misconduct Involving Investment Allocations – The applications for PNQ
Annuity 2 and PNQ Annuity 3 failed to provide for allocations to the sub-accounts.
The applications were not attached to PQ Annuity 4 and PQ Annuity 5.

71. The applications attached to PNQ Annuity 2 and PNQ Annuity 3 were
incomplete. They failed to provide for investment allocations to the sub-accounts. On
3/16/2000 a member of Prudential's southeast team faxed a blank form, titled
Investment Allocations Form, to Rucker requesting that allocations to the sub-
accounts be made. The form was sent after PNQ Annuity 2 and PNQ Annuity 3 had
been issued. The last of these contracts issued was PNQ Annuity 3 on 3/2/2000.
Rucker filled out the form with allocations. She and Mrs. Madigan signed the form.
But she falsified the form by dating it 2/29/2000. The falsified form was accepted.

23

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

The signed form does not indicate the annuities to which the allocations apply. The initial statements sent Madigans by Prudential for PNQ Annuity 2 and PNQ Annuity 3 show that allocations were previously made without their approval. Obviously the southeast team sent the form to Rucker to support allocations already made.

72. No applications for PQ Annuity 4 and PQ Annuity 5 are available. Notwithstanding, the allocations shown on the falsified form dated 2/29/2000 substantially match the actual allocations on the initial statement received from Prudential for PQ Annuity 4 dated 6/22/2000. Mrs. Madigan was not the owner or annuitant of PQ Annuity 4. Mr. Madigan being the owner and annuitant was required to sign the form. Regarding PQ Annuity 5 the initial statement received from Prudential is unavailable. It would be fraudulent to sign a document approving allocations prior to the sale of the annuities.

73. Misconduct Involving Forgery - It appears that on 7/6/2000 Lucci and Rucker may have acted together to forge Mrs. Madigan's signature on a document, titled Authorization to Initiate Trustee to Trustee Transfers of Certain Qualified Assets ("Authorization"). This IRS required document authorized the transfer of IRA funds maintained at AGS to Prudential. The Authorization was signed on 7/6/2000 by Rucker and Mildred A. Madigan. The signature of Mrs. Madigan appears to be a forgery. Lucci attached the Authorization to a memo also dated 7/6/2000 prepared on High Mark Financial letterhead which he signed and faxed to Prudential's Southeast Team.

24

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

74. <u>Misrepresentations Intended to Conceal Wrongful Annuity Sale</u> – Specifically with respect to predicate act 3, Lucci attempted to conceal his misconduct from Madigans when he made misrepresentations regarding deferred sales charges incurred upon the liquidation of mutual funds. Proceeds from these sales were used to fund a portion of the purchase price for PNQ Annuity 3.

75. Madigans sold mutual fund shares in Enterprise Growth Class B on 2/29/2000 for net $70,463.31 and incurred a deferred sales charge of $2,016.20. On 3/8/2000 Madigans apparently questioned Lucci about the charge. Lucci, who was on probation at the time, in a note written to Madigans stated that the deferred sales charge would be offset by a Prudential credit of $2,818.52 (4% x $70,463.31). He added in the note, "So you will make money by transferring." At the time of the sale Keller was the account executive at AGS.

76. Again, Defendant gave a similar explanation regarding mutual fund shares sold in Fidelity Adv. Growth Opportunity Class B on 3/8/2000 for $22,651.33, after incurring a deferred sales charge of $599.72. Defendant in a note to Madigans wrote that the deferred sales charge would be offset by a Prudential credit of $930.04 (4% x $23,251.05).

77. The Prudential prospectus provides that credits provided to the purchaser of an annuity are not offsets for such charges.

78. <u>Failure to Supervise</u> - Prudential management failed to provide proper supervision of its own employees who reviewed the applications and Rucker, its appointed agent, who signed the applications. The three incomplete applications

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

attached to the PVL Policy, PNQ Annuity 2 and PNQ Annuity 3 state information upon which Prudential employees should have determined that the investments were unsuitable. Each application stated the age of Mr. Madigan and the PVL Policy application clearly stated Madigans' net income of $50,000 and net worth of $600,000.

79. The three applications for PVL Policy, PNQ Annuity 2 and PNQ Annuity 3 were incomplete as to other matters including allocations to the sub-accounts. Applications for PQ Annuity 4 and PQ Annuity 5 were not attached to the contracts. Prudential is unable to locate them. Because the annuities are variable allocations to the sub-accounts are critical. Yet, the only form that exists providing for allocations has been falsified. Falsified and known by the southeast team to have been falsified.

80. After PQ Annuity 5 was acquired, more than 92% of Madigans' declared net worth was invested in Prudential variable insurance products. All of the investments in the variable insurance products were invested in sub-accounts that varied with market performance. Rucker invested the funds in some of the riskiest sub-accounts offered by Prudential.

81. Age Discrimination in the Death Benefit - Prudential used its employees and agents to sell variable annuities to the elderly knowing that the annuities discriminated against purchasers older than 75 years of age at issuance. The annuities purchased by Madigans provided a death benefit that was inferior to the death benefit provided to a purchaser younger than 76 years of age at issuance. The annuities provided a death benefit payable for ten years from issuance but payable

USDC Middle District of Florida Tampa Division                Plaintiff v. Lucci, et al.

only during the accumulation period. A purchaser 77 years of age with an annuity

starting date on his or her 85th birthday (default date) was entitled to a death benefit

of eight years. A purchaser 75 years of age with an annuity starting date on his or

her 85th birthday was entitled to a death benefit of ten years. The only way a

purchaser 77 years of age could receive ten years of death benefit coverage would

be to extend the contract. In fact that is what happened in December 2007 and

October 2009.

82. This death benefit is crucial if the purchaser has acquired a variable annuity

with funds invested in sub-accounts that vary with investment performance. It would

not be crucial if the annuity was fixed.

83. Prudential may argue that once an annuity option is chosen by the annuitant

and payments begin any remaining death benefit is waived. That is, an annuitant

receives the last two years of the death benefit only if he or she extends the annuity

starting date. In the case of an 85 year old annuitant whose annuity is valued at less

than prior premium payments adjusted for withdrawals the decision to extend two

years is an important one.

84. These annuities were designed to discriminate against purchasers over 75

years old at the time of issuance. Prudential recognized this illegally as its 2007

prospectus provides that a person older than 75 years can no longer purchase extra

credit annuities of the type Madigans purchased.

85. Misrepresentations as to Suitability of Funding Vehicles for Variable Annuities

Prudential failed to make known to purchasers of its variable annuities that

27

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

Prudential Investment Services, Inc. (hereinafter referred as to "ASISI") had been violating Section 206(2) of the Investors Advisors Act of 1940 by accommodating widespread market timing in Prudential sub-accounts that serve as funding vehicles for variable annuities issued. ASISI was a wholly owned subsidiary of Prudential providing captive investment advice. Widespread market timing in Prudential sub-accounts began in late 1998 or earlier and continued through 2003. ASISI management knew of the market timing activities but did not believe them to be illegal although sub-accounts were negatively affected by the market timing activities. Prudential was the beneficiary of huge commissions it otherwise would not have received. In 2009 ASISI was required to pay $34 million in fines to the SEC and $34 million to owners of variable annuity contracts issued by Prudential. The acts of ASISI are attributable to Prudential. It ratified the actions of ASISI and received the benefits.

86. Rucker was an appointed agent of Prudential. Rucker signed the PNQ Annuity 2 and PNQ Annuity 3 as agent for Prudential. Rucker was the agent for PQ Annuity 4 and PQ Annuity 5. Rucker was acting within her scope of authority. Under agency principles, including respondeat superior, Prudential is liable for her actions. Whether her authority was express, implied or apparent Prudential ratified her actions and accepted the benefits.  Although Rucker's actions were fraudulent being wanton and willful, Prudential would be liable as it knowingly ratified her actions.

87. Prudential is liable for the actions its employees independent of Rucker. Prudential management failed to properly supervise the southeast team and Rucker.

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

The applications submitted by Rucker were not properly reviewed by the southeast team. The applications did not provide for allocations to sub-accounts. Applications for PQ Annuity 4 and PQ Annuity 5 were not attached to the contracts. A Prudential representative informed Plaintiff that they are unavailable. Yet, Madigans had acquired variable annuities that required their investments to be allocated to sub-accounts.

88. The southeast team sent Rucker a Prudential investment allocation form on 3/16/2000 after PNQ Annuity 3 was issued and before PQ Annuity 4 was issued. Mrs. Madigan signed the form. Rucker falsified the date of signing as 2/29/2000. The initial statement sent to Madigans by Prudential show that the allocations were made on 3/2/2000. Obviously the southeast team sent the form to Rucker to support allocations already made without a signed approval. Also the allocations shown on the form may have been used to make allocations for PQ Annuity 4 issued 6/22/2000. Mrs. Madigan was neither the annuitant nor the owner of that annuity. Mr. Madigan was required to approve the allocations. By its actions the southeast team participated with Rucker the fraud. Discovery may provide more information.

89. Prudential used its employees and agents to sell variable annuities to the elderly knowing that the annuities discriminated against purchasers older than 75 years of age at issuance. The annuities purchased by Madigans provided a death benefit that was inferior to the death benefit provided to a purchaser younger than 76 years of age at issuance. The only way a purchaser 77 years of age at issuance

29

USDC Middle District of Florida Tampa Division         Plaintiff v. Lucci, et al.

could receive ten years of death benefit coverage would be to extend the contract. In fact that is what happened in December 2007 and October 2009.

90. Prudential failed to make known to purchasers of its variable annuities that Prudential Investment Services, Inc. (hereinafter referred as to "ASISI") had been violating Section 206(2) of the Investors Advisors Act of 1940 by accommodating widespread market timing in Prudential sub-accounts that serve as funding vehicles for variable annuities issued. ASISI was a wholly owned subsidiary of Prudential providing captive investment advice. Widespread market timing in Prudential sub-accounts began in late 1998 or earlier and continued through 2003. ASISI management knew of the market timing activities but did not believe them to be illegal although sub-accounts were negatively affected by the market timing activities.

Predicate Acts 6 and 7

91. With respect to PVL Policy, Rucker, Lucci and Knox provided investment advice to Madigans recommending that additional premium payments be paid. On 8/12/2005 Madigans made a premium payment of $3,000. On 6/19/2006 Madigans made a premium payment of $2,245.75. These payments were not contractually required. At the time of the recommendations Madigans' accounts were managed by Lucci employed by and registered with Aura Financial Services, Inc. ("AFS"). Rucker was designated as the agent of record for the PVL Policy. Knox was employed by AFS and Madigans' investment advisor registered with Aura Asset Management, Inc. ("AAM"), an advisor firm and an affiliate of AFS. With respect to these payments

30

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

Plaintiff alleges violations of   §§517.301 and 817.29 Fla. Stat. and committed
common law fraud. To avoid duplication common misconduct applicable to the two
alleged violations follows predicate act 7.

Predicate 6

92. On 8/12/2005, upon the recommendations of Lucci and Rucker, Madigans
paid a premium payment of $3,000 on PVL Policy. The $3,000 payment was
invested in a Prudential sub-account, titled AST T Rowe Asset Allocation, a highly
conservative sub-account. Only $582.39 of the original payment of $40,538.47
remained prior to the recommended infusion. At the time of the infusion Madigans'
monthly insurance and tax cost was almost $400. The history of any positive return
on the AST T Rowe Asset Allocation sub-account shows that any monthly earnings
increase to the account value would be less than $5. In fact a 160% ROI on the
$3,000 investment would be required in order to maintain an account value of
$582.39 after paying monthly costs of $400. Madigans incurred a loss of more than
$5,000 calculated under §517.211 Fla. Stat. or using a method proper for violations
of §817.29 Fla. Stat.

Predicate Act 7

93. On 6/19/2006, upon the recommendations of Rucker, Lucci and Knox,
Madigans paid a premium payment of $2,245.75 on PVL Policy. The $2,245.75
payment was invested in Prudential sub-accounts, titled AST T Rowe Allocation
(25%) and Fixed Allocation (75%). The fixed allocation paid a 3.50% interest rate.
Only $771.83 of the original payment of $40,538.47 remained prior to the

31

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

recommended infusion. At the time of the infusion Madigans' monthly insurance and

tax cost was almost $400. The investments in the two sub-accounts would generate

monthly earnings of less than $5. In fact a 200% ROI on the $2,245.75 investment

would be required in order to maintain an account value of $771.83 after paying

monthly costs of $400. Madigans incurred a loss of more than $$3,600 calculated

under §517.211 Fla. Stat. or using a method proper for violations of §817.29 Fla.

Stat.

Misconduct – Predicate Acts 6 and 7

94. If the $3,000 premium payment had not been made, the account value would

have been sufficient to keep the policy in the black for less than two months.

Because the $3,000 premium payment was made, the PVL Policy could survive for

another seven months. The monthly insurance and tax cost was not going away.

The account value as low as it was, even with the cash infusion, could not grow fast

enough as any earnings would always be less than the monthly costs. Small cash

infusions were not the answer. However, small cash infusions certainly put money in

the pockets of Rucker, Lucci, Knox and Prudential.

95. Predicate acts 6 and 7 are acts independent of predicate 1. They represent

fraudulent schemes in which misrepresentations were made regarding the viability of

the PVL Policy, that is, the variable life insurance policy could be saved if additional

premium payments were made. Rucker, Lucci and Knox are alleged to have

committed fraud by means of omission, that is, to make the representations not

misleading they would be required to state that the policy could only be saved with a

32

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

substantial cash infusion of some $50,000. It was simply a scam to induce Madigans

to part with property. The fact that Lucci, Rucker and Knox could tie the scam to the

policy was important only as reason that would convince Madigans that a phoenix

could raise from the ashes.

96. Rucker was the agent of record for the PVL Policy when predicate acts 6 and

7 were committed. Rucker was an agent for Prudential acting within the scope of her

authority. Under agency principles, including respondeat superior, Prudential is liable

for to Plaintiff for her actions whether her authority was express, implied or apparent

inasmuch as it ratified the actions and accepted the benefits. Although Rucker's

actions were fraudulent being wanton and willful, Prudential would be liable as it

knowingly ratified her actions and accepted the benefits.

97. At the time of the investment advice Madigans' accounts were managed by

Lucci employed by and registered with AFS. Knox was employed by and registered

with AFS. She was also an investment advisor registered with AFS affiliate AAM and

a paid investment advisor to Madigans.

Predicate Acts 8 and 9

98. Effective 2/1/2008, the annuity starting dates for PNQ Annuity 2 and 3 were

extended to 2/1/2038. Prudential, Lucci and Knox misrepresented the transaction as

an extension rather than a disposition followed by a subsequent reinvestment in

other securities held by Prudential. Plaintiff alleges a violation of §517.301 Fla. Stat.

and §817.29 Fla. Stat committed common law fraud. To avoid duplication common

misconduct applicable to the two alleged violations follows predicate act 9.

33

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et *al.*

### Predicate 8

99. On 12/5/2007 upon the recommendation of Lucci and Knox, Mr. Madigan requested that Prudential extend the annuity starting date for PNQ Annuity 2 "...to the maximum allowable under the contract." On 12/10/2007 the request with a cover letter was sent by facsimile from Lucci's office. The cover letter, on Robert Lucci, Inc. letterhead, was signed by Knox. In response, on 12/11/2007, Joseph LaTorre, Vice President of Prudential Marketing Inc., informed Mr. Madigan that the annuity date for each contract was changed.  Endorsements were attached signed by Joseph Emanuel ("Emanuel"), Secretary of Prudential, changing the dates to 2/1/2038. Without consulting Mr. Madigan, Emanuel chose the specific annuity date.

100. Mr. Madigan was 84 years of age at the time of the request and 85 years of age at 2/1/2008. Mr. Madigan would be 115 years of age at 2/1/2038, the new annuity starting date. According to the mortality tables used by Prudential in the contract, Mr. Madigan could not possibly live longer than six months past his 115th birthday. For the reasons disclosed below the change of the annuity starting date resulted in a disposition of PNQ Annuity 2 and the acquisition of securities held by Prudential ("Security 8") not an annuity. With respect to Security 8 Madigans incurred a loss of more than $10,100 calculated under §517.211 Fla. Stat.

### Predicate Act 9

101. On 12/10/2007, upon the recommendation of Lucci and Knox, Mr. Madigan requested that Prudential extend the annuity starting date for PNQ Annuity 3 "...to the maximum allowable under the contract." On 12/10/2007 the request with a cover

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

letter was sent by facsimile from Lucci's office. The cover letter, on Robert Lucci, Inc. letterhead, was signed by Knox. In response, on 12/11/2007, Joseph LaTorre, Vice President of Prudential Marketing Inc., informed Mr. Madigan that the annuity date for each contract was changed.  Endorsements were attached signed by Emanuel, Secretary of Prudential, changing the dates to 2/1/2038. Without consulting Mr. Madigan, Emanuel chose the specific annuity date.

102. Mr. Madigan was 84 years of age at the time of the request and 85 years of age at 2/1/2008. Mr. Madigan would be 115 years of age at 2/1/2038, the new annuity starting date. According to the mortality tables used by Prudential in the contract, Mr. Madigan could not possibly live longer than six months past his 115th birthday. For the reasons disclosed below the change of the annuity starting date resulted in a disposition of PNQ Annuity 2 and the acquisition of securities held by Prudential ("Security 9") not an annuity. With respect to Security 9 Madigans incurred a loss of more than $12,829 calculated under §517.211 Fla. Stat.

Misconduct – Predicate Acts 8 and 9

103. A non-qualified deferred variable annuity has two distinct phases, an accumulation phase beginning with the issuance of the contract and a payout phase beginning with the annuity starting date. This fact is recognized by Prudential in the contracts as well as its prospectus. Distinct means that the two periods are not the same. A material modification to a non-qualified annuity, such as extending the annuity date to a date that obliterates the distinction between the accumulation

35

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

phase and payout phase, results in the re-characterization of the annuity. The IRS has provided guidance.

104. The IRS §1.72-2(b) regulations provide that payments received by an annuitant under a contract after the annuity starting date qualify as annuity payments only if periodic payments are paid over a period longer than one year. According to the mortality tables it is statistically impossible for Mr. Madigan to live longer than six months past his 115th birthday. On 2/1/2038 his payout period would begin lasting for only six months. Because the contracts will never annuitize, do not pay annuity payments, the contracts, as changed, would no longer qualify as tax deferred annuities.

105. In a prospectus issued two years prior to the extensions Prudential warns annuitants to be aware that if an extension of the annuity date is sought beyond the default date, the IRS may not consider the revised contract an annuity which would result in an immediate taxable disposition. The contracts provided for a default date if an annuitant fails to provide Prudential with an annuity date. That date is the first day of the month following the later of the annuitant's 85th birthday or the 5th anniversary of the issuance of the contract. The annuity date originally chosen by Mr. Madigan was 2/1/2008 for PNQ Annuity 2 and 3/1/2008 for PNQ Annuity 3 matching what otherwise would be the default date. Mr. Madigan requested a change of the annuity date "to the maximum allowable under the contract." Emanuel chose the specific annuity starting dates.

USDC Middle District of Florida Tampa Division                 Plaintiff v. Lucci, et al.

106. Under the circumstances the changes in the annuity dates resulted in dispositions of PNQ Annuity 2 and 3. Because the investment remains with Prudential, Madigans acquired Security 8 and 9 not annuities.

107. Although the result in hindsight may seem opportune the decision by Emanuel to extend the annuity dates to 2/1/2038 only worsened what had been an inadvisable recommendation by Lucci and Knox with which to begin.

108. The investment advice recommended by Lucci and Knox was unsuitable to the needs of the Madigans. Mr. Madigan was 84 years of age at the time of the recommendation and would be 85 prior to the original annuity date of 2/1/2008. Mrs. Madigan was 83 years of age and had been diagnosed with Alzheimer's disease. Over 90% of Madigans' net worth was invested in annuities. Madigans were in need of liquidity evidenced by their withdrawals from annuities and mutual funds to meet their shortfall (monthly needs exceeded monthly net income). The funds within PNQ Annuity 2 and 3 could be withdrawn without any cost or other impediment, thus, avoiding the need to liquidate other investments at an excessive cost. The liquidation of these annuities would resulted in substantial income tax losses that could have been used to offset the income associated with liquidating PQ Annuity 4, if he had been advised to do so. In addition the losses could have been used to offset other 2008 taxable income, obtain a refund by carrying back the losses to prior tax years or carried forward to reduce taxes future years' taxes. Mrs. Madigan has zero taxable income at this point. Plaintiff only became aware that the annuity dispositions resulted in income tax losses in early 2014.

USDC Middle District of Florida Tampa Division               Plaintiff v. Lucci, et al.

109. If Lucci and Knox had been concerned with the best interests of the Madigans they would have recommended that Mr. Madigan liquidate his investment in the annuities but in no event should the extension be for longer than two years. If Emanuel had been concerned with the best interests of the Madigans he would have limited the extension to two years. Refer to paragraphs 81 to 84. Neither Lucci and Knox nor Emanuel were concerned with Madigans' best interests. Lucci and Knox wanted more commissions. Emanuel wanted his employer to manage the funds longer collecting sales commissions and fees, including excessive insurance fees.

110. Madigans do not represent an isolated case. Any purchaser of this type of annuity who was older than 75 years of age at the time of issuance and experienced a loss in the original investment due to stock conditions may have considered or upon the recommendation of the broker considered extending the annuity starting date to take advantage of the death benefit which Prudential would otherwise deny. Madigans had to extend the annuity date in order to receive death benefits younger purchasers received without extending the annuity date. Prudential's discriminatory practice by design induced purchasers such as Madigans to seek an extension.

111. However, Plaintiff alleges that Lucci and Knox had another purpose. Once PNQ Annuity 2 and 3 contracts were annuitized and annuity payments begin, commissions are no longer paid. Also, once annuitized, Prudential and not Madigans would be in control of the funds. That is, the funds could not be moved out of these contracts and into annuities issued by other insurance companies. By extending the annuity date, Lucci could do just that.

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

112. On 3/24/2008, seven weeks after the original annuity date 2/1/2008, funds were transferred out of PNQ Annuity 2 and 3 into two non-qualified deferred indexed annuity contracts issued by Bankers Life. Bankers Life Annuity 18 was funded with $25,000 rolled over from PNQ Annuity 2. Bankers Life Annuity 17 was funded with $19,946.64 rolled over from PNQ Annuity 3. Blair Larsen ("Larsen"), an in-house agent employed by Bankers Life, was the selling agent. As a result of transfers Madigans lost death benefits and were subject to Bankers Life surrender charges otherwise not applicable to the Prudential annuities.

113. Lucci was licensed in Florida as an agent and appointed by other insurance carriers. Lucci was previously the agent of record. As regards the extension request, an officer of Prudential acting within the course of his employment permitted Lucci to act as its agent. He acted within the scope of his authority. Whether his authority was express, apparent or implied, the Prudential officer acting within his course of employment ratified his actions and accepted the benefits of his actions. Under agency principles, including respondeat superior, Prudential is liable for Lucci's actions. Although Lucci's actions were fraudulent being wanton and willful, Prudential would be liable as it knowingly ratified her actions.

114. At the time of the recommendations Madigans' accounts were managed by Lucci employed by and registered with AFS. Knox was employed by and registered with AFS. She was also an investment advisor registered with AFS affiliate AAM and a paid investment advisor to Madigans.

39

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

115. But Prudential was liable to Plaintiff for its own actions independent of Lucci and Knox. First, a Prudential officer chose to change the annuity starting dates for PNQ Annuity 2 and 3 without further consultation with Madigans. The officer knew his actions would result in dispositions. He had been warned by his employer. By knowingly misrepresenting the dispositions of PNQ Annuity 2 and 3 as extensions Prudential could manage the investments as annuities collecting sales commissions and charging excessive fees, including a 1.25% mortality & expense risk fee. The officer intended benefit his employer at the expense of Madigans.

116. According to a prospectus the mortality & expense risk fee is an insurance charge intended to cover risks associated with a decline in one's investment due to market performance and an annuitant who lives longer than the guaranteed payment period. By extending the annuity dates to 2/1/2038, it is statistically impossible for Mr. Madigan to live longer than six months past his 115th birthday. Therefore, it is impossible that he would live longer than the guaranteed payment period. The insurance charge may be appropriate for the first two years following the extension as the full death benefit period had not expired. But after that period expired the charge is clearly excessive. The damages are about $400 (1.25% x Average Account Balance x Number of Days) per annuity.

117. Second, Prudential knowingly engaged in a discriminatory course of business which operated as a fraud upon Madigans and others. The annuities purchased by Mr. Madigan provided a death benefit that was inferior to the death benefit provided

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

to a purchaser younger than 76 years of age at issuance. Incorporated herein are paragraphs 81 to 84.

118. By its own discriminatory actions Prudential set in motion the need for an affected purchaser to request an extension. When an issuer practices discrimination and engages in a course of business that operates as a fraud upon an affected purchaser, it is liable for the natural consequences that flow therefrom even the fraudulent misconduct of the agent or broker in recommending the extension.

119. The Prudential officer knew that Mr. Madigan was 77 years of age at issuance. It knew that the original investment in the annuities had declined in value due to poor market performance. It knew that the death benefit provided Madigans with a lamentable measure of protection. It knew that the annuity in question discriminated against Mr. Madigan as evidenced by a 2007 prospectus stating that a person older than 75 at issuance can no longer purchase this type of annuity. Yet, in correspondence sent prior to the original annuity starting date informing annuitants of their options Prudential knowingly failed to state that a purchaser in Mr. Madigan's circumstances should consider extending the annuity starting date in order to receive the full measure of the death benefit. Its misconduct was concealed.

120. For newly issued annuities of this type, Prudential no longer practices discrimination. In the prospectus the death benefit is no longer limited to a ten year period although it is not paid beyond the accumulation period. Prudential charges the mortality & expense risk fee throughout the accumulation period. It is highly unlikely that Prudential will extend newly issued annuities of the type Madigans

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

purchased for a period of 30 years. By the way Madigans were required to pay the

mortality & expense risk fee during the new accumulation period of 2/1/2008 through

2/1/2038 but were not eligible to receive this new death benefit.

121. Prudential used its employees and agents, including Lucci, Rucker and

Keller, to sell variable annuities to the elderly knowing that the annuities provided

inferior death benefits purchasers older than 75 years of age at issuance. These

annuities were designed to discriminate. This allowed Prudential to manage the

funds longer and collect sales commissions and fees, including excessive insurance

fees.

Predicate Acts 10 and 11

122. Effective 2/1/2008, the annuity starting date for PQ Annuity 4 was extended to

2/1/2038. Effective 10/1/2009, the annuity starting date for PQ Annuity 5 was

extended to 1/1/2039. Prudential, Lucci and Knox misrepresented the transaction as

an extension rather than a disposition followed by a subsequent reinvestment in

other securities. Plaintiff alleges violations of §517.301 Fla. Stat. and §817.29 Fla.

Stat committed common law fraud. To avoid duplication common misconduct

applicable to the two alleged violations follows predicate act 11.

Predicate Act 10

123. Upon the recommendations of Lucci and Knox, Mr. Madigan requested that

Prudential extend the annuity starting date for PQ Annuity 4 from 2/1/2008 "…to the

maximum allowable under the contract." On 12/10/2007 this request with a cover

letter was sent by facsimile from Lucci's office. The cover letter, on Robert Lucci, Inc.

42

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

letterhead, was signed by Knox. In response on 12/11/2007, Joseph LaTorre, Vice

President of Prudential Marketing Inc., informed Mr. Madigan that the annuity date

for of the contract was changed. An endorsement was attached signed by Emanuel,

and the date was changed to 2/1/2038. Without consulting Mr. Madigan, Prudential

chose the specific annuity date.

124. Mr. Madigan was 84 years of age at the time of the request and change. (His

85th birthday was 1/3/2008.) Mr. Madigan would be 115 years of age at 2/1/2038.

According to the mortality tables used by Prudential in the contract, Mr. Madigan

could not possibly live longer than six months past his 115th birthday. For the

reasons discussed below the change of the annuity date resulted in a disposition of

PQ Annuity 4 and the acquisition of securities held by Prudential ("Security 10") not

an annuity. With respect to Security 10 Madigans incurred a loss of more than

$6,200 calculated under §517.211 Fla. Stat.

## Predicate Act 11

125. Upon the recommendations of Lucci and Knox, Mrs. Madigan requested that

Prudential extend the annuity starting date for PQ Annuity 5 from 10/1/2009 "…I

would like to extend my maturity date to October 1, 1924." The letter requesting the

change was prepared by Lucci in his handwriting. This letter was sent by facsimile

from Lucci's office. On 10/16/2009 Joseph LaTorre, Vice President, Annuity

Operations, Prudential Annuities Distributors Inc. sent correspondence to Mrs.

Madigan that the annuity date was changed and attached an endorsement signed by

USDC Middle District of Florida Tampa Division            Plaintiff v. Lucci, et al.

Emanuel that the date was changed to 10/1/2039. Prudential changed the annuity
date to 10/1/2039 without further consultation with Mrs. Madigan.

126. Mrs. Madigan was 85 years of age at the time of the request. Mrs. Madigan
would be 115 years of age at 10/1/2039. According to the mortality tables used by
Prudential in the contract, Mrs. Madigan could not possibly live longer than six
months past her 115th birthday. For the reasons discussed below the change of the
annuity date resulted in a disposition of PQ Annuity 5 and the acquisition of
securities held by Prudential ("Security 11") not an annuity. With respect to Security
11 Madigans incurred a loss of less than $100 calculated under §517.211 Fla. Stat.

Misconduct – Predicate Acts 10 and 11

127. IRS regulations provide that a material modification in the terms of a qualified
annuity contract constitutes the issuance of a new contract. If the new contract is
considered a §408(b) IRA of the IRC the transfer is tax-free exchange under §1035.
If the new contract is considered a §408(a) IRA, then transaction is treated as a
disposition of the qualified annuity followed by a rollover contribution to the §408(a)
IRA which is not a taxable event. If the new contract is neither an individual
retirement annuity nor an individual retirement account, then the movement of the
funds is treated as a taxable distribution followed by a repurchase of previously held
investments or securities from Prudential.

128. A qualified annuity has two distinct phases, an accumulation phase beginning
with the issuance of the contract and a payout phase beginning with the annuity
starting date. This fact is recognized by Prudential in the contracts as well as its

CRITICAL

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

prospectus. Distinct means that the two periods are not the same. A material

modification to a qualified annuity, such as extending the annuity date to a date that

obliterates the distinction between the accumulation phase and payout phase,

results in a new contract which in the case at hand is not a qualified annuity. The

IRS has provided guidance.

129. The IRS §1.72-2(b) regulations provide that payments received by an

annuitant under a contract after the annuity starting date qualify as annuity payments

only if periodic payments are paid over a period longer than one year. According to

the mortality tables it is statistically impossible for either Mr. Madigan or Mrs.

Madigan to live longer than six months past his or her 115th birthday. Because the

contracts will never annuitize, not pay annuity payments, the contracts, as changed,

would no longer qualify for tax deferral or qualify as annuities.

130. In a prospectus issued two years prior to the extension Prudential warns

annuitants to be aware that if an extension of the annuity date is sought beyond the

default date, the IRS may not consider the revised contract an annuity which would

result in an immediate taxable event. The contract provided for a default date if an

annuitant fails to provide Prudential with an annuity date. That date is the first day of

the month following the later of the annuitant's 85th birthday or the 5th anniversary of

the issuance of the contract. The annuity date originally chosen by Mr. Madigan was

2/1/2008 matching what otherwise would be the default date. Mr. Madigan requested

a change in the annuity date "to the maximum allowable under the contract."

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

Prudential chose the specific annuity date. One must ask why Prudential would knowingly put Madigans in jeopardy.

131. For the reasons disclosed above, the new contracts will not be considered a §408(b) IRA. The transfer would not qualify as a tax-free exchange under §1035.

132. Therefore, the material modifications, changes in the annuity dates to 2/1/2038 and  10/1/2039, resulted in dispositions of PQ Annuity 4 and PQ Annuity 5. Because the funds remain with Prudential, Madigans acquired Security 10 and Security 11, that is, a §408(a) IRA or other securities held by Prudential.

133. Although the result in hindsight may seem opportune the decision by Emanuel to extend the annuity dates to 2/1/2038 and 10/1/2039 only worsened what had been an inadvisable recommendation by Lucci and Knox with which to begin.

134. Lucci and Knox knew that their recommendations were unsuitable to the needs of the Madigans. Mr. Madigan was 84 years of age at the time and would be 85 prior to the original annuity date of 2/1/2008. Mrs. Madigan was 85 years of age at 10/1/2009. Both were in poor health suffering from infirmities of aging. Mr. Madigan suffered from diabetes and Mrs. Madigan from Alzheimer's disease and other brain related physical impairments. Over 90% of Madigans' net worth would continue to be invested in annuities. Madigans were in need of liquidity evidenced by their withdrawals from annuities and mutual funds to meet their shortfall (monthly needs exceeded monthly net income). Madigans' tax status did not support continuing to invest in PQ Annuity 4 or PQ Annuity 5. In fact the liquidation of PNQ Annuity 2 and 3 would have resulted in substantial income tax losses that could

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

have been used to offset the income associated with liquidating PQ Annuity 4 and 5, if he had been advised to do so. Under the circumstances the changes in the annuity dates resulted in dispositions of PQ Annuities 4 and 5. Because the investment remains with Prudential, Madigans acquired Security 10 and 11 not being annuities.

135. If Lucci and Knox had been concerned with the best interests of the Madigans they would have recommended that Mr. Madigan liquidate his investment in the annuities but in no event should the extension be for longer than two years. Refer to paragraphs 81 to 84. If Emanuel had been concerned with the best interests of the Madigans he would have limited the extension to two years. Neither Lucci nor Emanuel were concerned with Madigans' best interests. Lucci wanted more commissions, trailing and sales. Emanuel wanted his employer to manage the funds longer collecting sales commissions and fees, including excessive insurance fees.

136. The dispositions of PNQ Annuity 2, PNQ Annuity 3, PQ Annuity 4 and PQ Annuity 5 as well as acquisitions of Security 8, 9, 10, 11 were part of an ongoing fraudulent scheme to generate commissions by inducing Madigans to dispose or acquire securities and fixed and indexed annuities. The overall scheme included the five Prudential variable insurance products in 2000, two F & G annuities in 2002, two Allianz annuities in 2005, an American Equity annuity in 2007, two Bankers Life annuities in 2008 and these dispositions of Prudential annuities and acquisitions of other securities, not being annuities.

137. Lucci was licensed in Florida as an agent and appointed by other insurance carriers. Along with Rucker, Lucci was previously the agent of record. As regards the

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

extension request, an officer of Prudential acting within his course of employment

permitted Lucci to act as its agent. He acted within the scope of his authority.

Whether his authority was express, implied or apparent, Prudential ratified his

actions and accepted the benefits of his actions. Therefore, Prudential is liable to

Madigans for Lucci's actions under agency principles, including respondeat superior.

138. At the time of the recommendations Madigans' accounts were managed by

Lucci employed by and registered with AFS. Knox was employed by and registered

with AFS. She was also an investment advisor registered with AFS affiliate AAM and

a paid investment advisor to Madigans.

139. But Prudential is liable to Plaintiff for its own actions independent of the

actions of Lucci and Knox. First, Mr. Madigan did not direct Prudential to extend the

annuity date for PQ Annuity 4 to 2/1/2038. Mrs. Madigan did not direct Prudential to

extend the annuity date for PQ Annuity 5 to 10/1/2039. Mr. Emanuel of Prudential

chose those dates without further consultation with Madigans. The officer knew his

actions would result in dispositions. He had been warned by his employer. But by

taking the actions he took Prudential could manage the investments as annuities

collecting sales commissions and charging excessive fees, including a 1.25%

mortality & expense risk fee. Emanuel intended to benefit his employer at the

expense of Madigans. Mr. Emanuel and Prudential misrepresented Madigans' new

investment as an annuity when it fact it could not be.

140. According to a prospectus the mortality & expense risk fee is an insurance

charge intended to cover risks associated with a decline in one's investment due to

market performance and an annuitant who lives longer than the guaranteed payment period. By extending the annuity dates to 2/1/2038 and 10/1/2039, it is statistically impossible for Mr. Madigan or Mrs. Madigan to live longer than six months past his or her 115th birthday. Therefore, it is impossible that he or she would live longer than the guaranteed payment period. The insurance charge may be appropriate for the first two years in the case of Mr. Madigan and one year in the case of Mrs. Madigan as the full death benefit period had not expired. But after that period expired the charge is clearly excessive. The damages are about $3,000 for PQ Annuity 4 and $200 for PQ Annuity 5 (1.25% x Average Account Balance x Number of Days) per annuity.

141. Second, according to ERISA and the tax laws Prudential as plan administrator or sponsor of PQ Annuities 4 and 5 is a fiduciary of the Madigans. It stood in a position of trust and confidence. The plans must be administered for the sole benefit of the employee and distributions must be made in accordance with §401(a)(9) of the IRC. Madigans received no benefits by extending the annuity dates 30 years out. The period over which surrender charges could be imposed had passed. Prudential was required to pay distributions whether in the form of required minimum distributions ("RMD") or annuity payments. But Prudential surely benefitted in ways it would not otherwise have benefitted. Refer to paragraphs 139 and 140. Lucci and Knox benefitted by receiving trailing commissions. An extension of two years for Mr. Madigan may have been appropriate in order that his wife might benefit from the two years remaining on his death benefit, discriminatory as it was. An

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

extension of one year for Mrs. Madigan may have been appropriate in order that his wife might benefit from the year remaining on her death benefit, discriminatory as it was. Refer to paragraphs 81 to 84 and 117 to 121.

142. Prudential is required to make distributions in accordance with §401(a)(9) of the IRC. Prudential failed to make distributions to Mrs. Madigan in 2009 to 2013 and Mr. Madigan in 2013. It retained the money for its own benefit. In January of years 2009 through 2013 Prudential sent IRS required letters to Mrs. Madigan stating that Prudential would pay the RMD amount in the following December as set out in the applicable letter according to prior instructions. In 2013 it sent a similar letter to Mr. Madigan. In years 2001 to 2008 Prudential paid RMD to Mrs. Madigan and in years 2001 to 2012 it paid RMD to Mr. Madigan. Relying upon Prudential's past practices and the January letters, Mrs. Madigan, suffering from Alzheimer's disease, was deceived in years 2009 to 2013. By the letter sent in January 2009 and its failure to pay RMD in December 2009, Prudential's failure to pay RMD may have been negligent. But in years thereafter Prudential's letters were sent knowing that it had failed to pay RMD in the prior years. Prudential, a fiduciary, with respect to Mrs. Madigan, a vulnerable adult, knowingly deceived her temporarily depriving her of the benefit of her assets for its own benefit, a common law fraud and a violation of §415.1111 Fla. Stat.

143. Third, Prudential knowingly engaged in a discriminatory course of business which operated as a fraud upon Madigans and others. The annuities purchased by Mr. Madigan provided a death benefit that was inferior to the death benefit provided

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

to a purchaser younger than 76 years of age at issuance. Incorporated herein are paragraphs 81 to 84 and 117.

144. Refer to paragraph 118 which is incorporated by reference.

145. Refer to paragraph 119 which is incorporated by reference.

146. Refer to paragraph 120 which is incorporated by reference.

147. Refer to paragraph 121 which is incorporated by reference.

### Predicate Acts 12 and 13

148. Lucci and Rucker recommended that Madigans the purchases of two fixed annuities issued by Fidelity & Guaranty. Plaintiff alleges violations of §817.29 Fla. Stat. To avoid duplication common misconduct applicable to the two alleged violations follows predicate act 13.

### Predicate Act 12

149. On 5/14/2002 on the recommendation of Lucci and Rucker Madigans purchased fixed annuity contract #03039578 issued by Fidelity & Guaranty ("F & G Annuity 12") for a cash consideration of $150,000 using checking account funds maintained at SouthTrust Bank. The proceeds were derived from the sale of Mrs. Madigan's interest in the inherited farm. Lucci was the selling agent. At the time of the purchase Madigans maintained a brokerage account with Sigma, and Rucker was the account executive. The transactions are parts of an overall fraudulent scheme to churn, twist or switch annuities with the primary purpose of generating commissions for Lucci, Rucker and others at the expense of Madigans. With respect

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

to F & G Annuity 12 Madigans incurred a loss of more than $8,600 calculated under §817.29 Fla. Stat.

## Predicate Act 13

150. On 6/27/2002 on the recommendation of Lucci and Rucker Madigans purchased fixed annuity contract #03065936 issued by Fidelity & Guaranty (F & G Annuity 13") for a cash consideration of $10,000 using checking account funds maintained at SouthTrust Bank. The proceeds were derived from the sale of Mrs. Madigan's interest in the inherited farm.  Lucci was the selling agent. At the time of the purchase Madigans maintained a brokerage account with Sigma, and Rucker was the account executive. The transactions are parts of an overall fraudulent scheme to churn, twist or switch annuities with the primary purpose of generating commissions for Lucci, Rucker and others at the expense of Madigans. With respect to F & G Annuity 13 Madigans incurred a loss of more than $2,700 calculated under §817.29 Fla. Stat.

## Misconduct – Predicate Acts 12 and 13

151. Mrs. Madigan was 77 years of age when F & G Annuity 12 and F & G Annuity 13 were purchased. After the transfers more than 95% of Madigans' net worth, excluding their Sarasota residence, was invested in annuities. Madigans' annual net income was insufficient to meet its current cash needs resulting in a shortfall which could be met only by liquidating mutual funds or withdrawing funds from annuities at a high cost. Madigans had a short time horizon. The annuities were subject to surrender charges. On 4/1/2004 Madigans withdrew $6,500 from F & G Annuity 12.

52

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

On 4/1/2004 Madigans withdrew $700 from F & G Annuity 13. Lucci arranged for the withdrawals. No suitability documents are available.

152. The sales of F & G Annuity 12 and F & G Annuity 13 were part of an ongoing fraudulent scheme engineered by Lucci and Rucker to generate commissions by inducing Madigans to acquire annuities. The scheme included past sales of Prudential variable insurance products in 2000.

Predicate Acts 14 and 15

153. Lucci and Rucker recommended that Madigans acquire two non-qualified deferred indexed annuities from Allianz by transferring funds out of PNQ Annuity 2 and PNQ Annuity 3. Plaintiff alleges violations of §817.29 Fla. Stat. and committed common law fraud. To avoid duplication common misconduct applicable to the two alleged violations follows predicate act 15.

Predicate Act 14

154. On 8/26/2005, pursuant to recommendations by Lucci and Rucker, Madigans acquired a non-qualified deferred indexed annuity #70332115 issued by Allianz ("Allianz Annuity 14") by way of transfer of $100,000, after surrender charges of $4,678.62, from PNQ Annuity 2. The growth of the account value was based upon an indexed benefit. With respect to Allianz Annuity 14 Madigans incurred a loss of more than $19,000 calculated under §817.29 Fla. Stat. Lucci was an agent of Allianz and was employed by and registered with AFS.

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

## Predicate Act 15

155. On 8/26/2005, pursuant to a recommendations by Lucci and Rucker, Madigans acquired a non-qualified deferred indexed annuity #70332137 issued by Allianz ("Allianz Annuity 15") by way of transfer of $100,000, after surrender charges of $4,594.12, from PNQ Annuity 3. The growth of the account value was based upon an indexed benefit. With respect to Allianz Annuity 15 Madigans incurred a loss of more than $19,000 calculated under §817.29 Fla. Stat. Lucci was an agent for Allianz and was employed by and registered with AFS.

## Misconduct – Predicate Acts 14 and 15

156. At the time of the transfer of $100,000 from PNQ Annuity 2 to Allianz Annuity 14 and the transfer of $100,000 from PNQ Annuity 3 to Allianz Annuity 15, Mr. Madigan was 82 years of age. After the transfers more than 90% of Madigans' net worth, excluding their Sarasota residence, was invested in annuities. Madigans' annual net income was insufficient to meet its current cash needs resulting in a shortfall which required to access funds in their brokerage accounts managed by Lucci or the withdrawal of funds from the annuities. In 2011 Madigans withdrew $10,000 from Allianz Annuity 14 and $10,000 from Allianz Annuity 15 in order to meet cash shortages.

157. A comparison of the Allianz annuities and Prudential annuities follows. The Allianz annuities provided that the period over which surrender charges were payable would end 8/1/2015; whereas, the Prudential surrender period ended 2/1/2008. Because the Madigans were elderly and their net income was insufficient

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

to meet current cash needs it would have been important that they could withdraw funds in large amounts without paying a surrender charge. Obviously, the acquisition of the Allianz annuities does not suit the needs of the Madigans.

158. The Allianz annuities provided for an annuity starting date of 8/1/2015; whereas, the Prudential annuities provided for a date of 2/1/2008. By delaying the beginning of the payout period, the potential benefit of choosing to accept payments over life, life expectancy or life with a term certain has been virtually eliminated. It is highly unlikely that Mr. Madigan would live beyond the guaranteed payment period. There was a much better chance that he would have benefitted had the funds remained with Prudential.

159. The Allianz annuities provided an inferior death benefit. Upon the death of the annuitant the beneficiary would receive a return of the original investment excluding any credits applied to the account value. In effect the beneficiary would be forced to select a payout option over his or her life, life expectancy or life with a term certain. Allianz has structured an annuity that allows it to manage the funds for a longer period. The Prudential annuities provided that upon the death of the annuitant within the accumulation period the beneficiary would receive either the greater of the original investment increased by any credits or the account value increased by any credits. If the annuitant dies after the accumulation has ended, the beneficiary receives the account value increased by any credits. This Allianz annuity has been the subject of a class action law suit in which claimants argued that Allianz retained

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

control of claimants' investment for an excessive period by providing an inadequate death benefit.

160. No suitability documents are available. This is no writing available showing that Lucci or Rucker addressed the suitability of the investment or advised Madigans of the following: the period during which surrender charges applied had been extended from 2/1/2008 to 8/1/2015; the annuity starting date would change from 2/1/2008 to 8/1/2015 and, as a result, the potential benefit of choosing to accept payments over life, life expectancy or life with a term certain has been virtually eliminated as it is highly unlikely that Mr. Madigan would live beyond the guaranteed payment period; and the Allianz annuities provided an inferior death benefit.

161. The transfers resulted in the payment of substantial surrender charges to Prudential in the amount of $9,272.74. Upon the surrender of PNQ Annuity 2 Madigans incurred surrender charges of $4,678.62. Upon the surrender of PNQ Annuity 3 Madigans incurred surrender charges of $4,594.12. These charges could have been avoided had Lucci recommended a change in Prudential sub-account allocations.

162. The transfers resulted in lost death benefits. The death benefits were extremely important to Madigans. Madigans' original investment in PNQ Annuity 2 and PNQ Annuity 3 had severely declined. The sub-accounts in which Lucci and Rucker had recommended that Madigans place their investments had performed poorly. The death benefit with respect to PNQ Annuity 2 fell from $194,728.91 to $90,050.19. The death benefit with respect PNQ Annuity 3 fell from $210,646.86 to

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

$106,052.74. Total loss of Prudential death benefits was $209,272.84. Of course the loss of death benefits is offset by $200,000 of death benefits provided by Allianz. The net loss was $9,272.84. The lost death benefits would have been available through March 2010.

163. Refer to predicate acts 6 and 7. Lucci, Rucker and Knox advised and convinced Madigans to pay additional premium payments of $3,000 on 8/12/2005 (14 days prior to the transfers to Allianz) and $2,245.75 on 6/19/2006 with respect to PVL Policy. Those recommended cash infusions could not resurrect PVL Policy. The cash infusions provided Madigans with less than one year of life insurance coverage in an amount of $100,000. Lucci, Rucker and Knox were recommending that Madigans make cash fusions that provided a benefit lasting less than one year. At or about the same time they recommended and convinced Madigans to transfer $200,000, after deducting surrender charges of $9,272.74, out of Prudential annuities into Allianz indexed annuities. Net death benefits of $34,272.84 otherwise available through March 2010 were lost. On the one hand they recommended that Madigans pay $5,245.75 in premiums to obtain less than one year of life insurance coverage in an amount of $100,000, and on the other hand recommended that Madigans pay $9,272.74 in surrender charges to lose $9,272.84 of death benefits.

164. The sales of Allianz Annuity 14 and Allianz Annuity 15 were part of an ongoing fraudulent scheme to generate commissions by inducing Madigans to dispose or acquire securities and fixed and indexed annuities. The overall scheme included the five Prudential variable insurance products in 2000, two F & G annuities

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

in 2002, two Allianz annuities in 2005, an American Equity annuity in 2007, two

Bankers Life annuities in 2008 and the four dispositions of Prudential annuities in

2008 and 2009 and the concomitant acquisitions of other securities, not being

annuities.

165. Lucci and Rucker were licensed agents in Florida and appointed by Allianz.

Lucci signed the contract as agent for Allianz. Lucci was acting within his scope of

authority. Under agency principles, including respondeat superior, Prudential is liable

for his actions inasmuch as it ratified the actions and accepted the benefits.

Although Lucci's actions were fraudulent being wanton and willful, Allianz would be

liable as it knowingly ratified his actions and appointed agents with a checkered

past.

166. At the time of the acquisitions Madigans' accounts were managed by Lucci

employed by and registered with AFS. Knox was employed by and registered with

AFS. She was also an investment advisor registered with AFS affiliate AAM and a

paid investment advisor to Madigans.

Predicate Act 16

167. On 7/13/2007, upon recommendations by Lucci and Knox, Mrs. Madigan

acquired an non-qualified indexed annuity contract #643584 issued by American

Equity ("AE Annuity 16") as a replacement for F & G Annuity 12. At the time of the

replacement the value of F & G Annuity 12 was $187,952.76. With respect to AE

Annuity 16 Madigans incurred a loss of almost $15,000 calculated under §817.29

Fla. Stat. Lucci was the selling agent and Knox the investment advisor. At this time,

58

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

Lucci was employed by and registered with AFS. Lucci and Knox are alleged to have violated §817.29 and committed common law fraud.

Misconduct – Predicate Act 16

168. At the time of the replacement of F & G Annuity 12 for AE Annuity 16, Mrs. Madigan was 83 years of age. After the transfers more than 90% of Madigans' net worth, excluding their Sarasota residence, was invested in annuities. Madigans' annual net income was insufficient to meet its current cash needs resulting in a shortfall which required to access funds in their brokerage accounts managed by Lucci or withdraw funds from the annuities. Madigans withdrew the following amounts from AE Annuity 16. On 1/1/2011 Madigans withdrew $18,000. On 1/1/2012 they withdrew $4,736.85, after surrender charges of $263.15. On 2/1/2012 they withdrew $4,000, after surrender charges of $210.52. On 5/1/2012 they withdrew $4,263.16, after surrender charges of $$236.84. On 11/1/2012 they withdrew $19,436.50. On 3/1/2013 they withdrew $17,000, after surrender charges of $708.33. All withdrawals were arranged by Lucci. As a result of the exchange Madigans had to encounter a new surrender period of ten years.

169. F & G Annuity 12 was the only annuity contract sold by Lucci or Rucker to the Madigans that experienced an ROI of 5%. To date AE Annuity 16 has experienced an ROI of 3%. Prior to the exchange Fidelity & Guaranty notified Mrs. Madigan that the interest rate with respect to F & G Annuity 12 would fall from 5.8% to 4.2%. The original contract set the interest rate for 5 years. In July 2007 a 10 year Treasury note carried a yield of about 4.9%. High grade corporate bonds were substantially

59

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

higher. A well-managed account would have invested the money at a compounded interest rate of at least 5%.

170. In the case of an elderly client who is currently investing in a fixed product, any movement away from that fixed product to an indexed product should be addressed with extreme care. A suitability document addressing the shift from a fixed to an indexed product would be appropriate if not required. No such document is available.

171. It is alleged that Lucci and Knox recommended the purchase of annuities because the sales commissions were higher than purchasing U.S. treasuries or high grade corporate bonds. Lucci and Knox recommended a shift to indexed annuities because they pay higher sales commissions than fixed annuities. The indexed annuities also pay trailing commissions based upon the customer's account value.

172. The sale of AE Annuity 16 was part of the ongoing fraudulent scheme to generate commissions by inducing Madigans to acquire to dispose or acquire securities and fixed and indexed annuities. The overall scheme included the five Prudential variable insurance products in 2000, two F & G annuities in 2002, two Allianz annuities in 2005, an American Equity annuity in 2007, two Bankers Life annuities in 2008 and the four dispositions of Prudential annuities in 2008 and 2009 and the concomitant acquisitions of other securities, not being annuities.

173. Lucci was a licensed agent in Florida and appointed by American Equity. Lucci signed the contract as agent for American Equity. Lucci was acting within his scope of authority. Under agency principles, including respondeat superior,

60

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

American Equity is liable for his actions inasmuch as it ratified the actions and

accepted the benefits. Although Lucci's actions were fraudulent being wanton and

willful, American Equity would be liable as it knowingly ratified her actions and

appointed an agent with a checkered past.

174. At the time of the acquisition Madigans' accounts were managed by Lucci

employed by and registered with AFS. Knox was employed by and registered with

AFS. She was also an investment advisor registered with AFS affiliate AAM and a

paid investment advisor to Madigans.

Predicate Acts 17 and 18

175. Madigans acquired two annuities from Bankers Life, indexed annuity

#7886474 ("Bankers Life Annuity 17") and indexed annuity #7886463 ("Bankers Life

Annuity 18"). Madigans allege a violation of §817.29 Fla. Stat. and committed

common law fraud. To avoid duplication common misconduct applicable to the two

alleged violations follows predicate act 18.

Predicate Act 17

176. On 3/24/2008 Madigans transferred $25,000 out of PNQ Annuity 3 into

Bankers Life Annuity 17. The issue date for the Bankers Life annuities was

3/31/2008. Larsen, an employee of Bankers Life, was the selling agent although

events suggest Lucci provided an introduction. At this time Lucci and Knox were

employed by and registered with AFS. With respect to Bankers Life Annuity 17

Madigans incurred a loss of more than $5,700 calculated under §817.29 Fla. Stat.

61

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

### Predicate Act 18

177. On 3/24/2008 Madigans transferred $19,946.64 out of PNQ Annuity 2 into Bankers Life Annuity 18. The issue date for the Bankers Life annuities was 3/31/2008. Larsen, an employee of Bankers Life, was the selling agent although events suggest Lucci provided an introduction. At this time Lucci and Knox were employed by and registered with AFS. With respect to Bankers Life Annuity 18 Madigans incurred a loss of more than $4,600 calculated under §817.29 Fla. Stat.

### Misconduct – Predicate Acts 17 and 18

178. Only a few weeks earlier Madigans upon the recommendations of Lucci and Knox requested changes to the annuity starting dates for PNQ Annuity 2 and PNQ Annuity 3. Madigans requested each date be changed "to the maximum date allowable under the contract." A Prudential officer chose to change the dates to 2/1/2038 without consultation with Madigans.

179. Lucci and Knox wanted to extend these dates, as once the contacts are annuitized and annuity payments begin, commissions are no longer paid. Lucci could receive trailing commissions in future years to which he would not otherwise be entitled. Also, once annuitized, Madigans would no longer be in control of the funds. That is, the funds could not be moved out of these contracts and into annuities issued by other insurance companies.

180. On 3/24/2008, seven weeks after 2/1/2008, the effective date of the extensions, funds were transferred out of the PNQ Annuity 2 and PNQ Annuity 3 into

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

Bankers Life Annuity 18 and Bankers Life Annuity 17, respectively. Larsen signed as agent.

181. Madigans allege that the transfers out of the Prudential annuities to the Bankers Life annuities were part of a scheme employed by Lucci and Knox with its purpose to generate commissions for them by deceiving Madigans to whom they owed a fiduciary duty. Plaintiff alleges that Lucci recruited Larsen knowing that Madigans had previously used Larsen for its health insurance needs. Plaintiff alleges that Lucci benefitted from the annuity sales. This relationship will be uncovered through the discovery process.

182. At the time of the transfer of $25,000 from PNQ Annuity 3 to Bankers Life Annuity 17 and the transfer of $19,946.64 from PNQ Annuity 2 to Bankers Life Annuity 18, Mr. Madigan was 84 years of age. Larsen's notes indicate that Madigans' liquid assets were less than $80,000 and annuities were about $500,000, or more roughly 85% of Madigans' liquid net worth. He wrote on the application that the acquisitions "would not create a hardship." He was also aware that Madigans were concerned with any loss of death benefits. Probably, the result of discussions Madigans had had with Lucci and Knox weeks earlier when PNQ Annuities 4 and 5 were extended. Nonetheless Bankers Life Annuities 17 and 18 provided inferior death benefits to those ceded when funds were moved from the Prudential annuities.

183. In addition to the loss of death benefits, Larsen placed Madigans in annuities that result in surrender charges had Madigans withdrawn funds prior to 3/24/2018.

USDC Middle District of Florida Tampa Division               Plaintiff v. Lucci, et al.

The surrender period for the Prudential annuities had ended 2/1/2008. Because the Madigans were elderly and their net income was insufficient to meet current cash needs it would have been important that they could withdraw funds without paying a surrender charge.

184. The Bankers Life annuities provided for an annuity starting date of 3/31/2022; whereas, the Prudential annuities provided for a date of 2/1/2008. By delaying the beginning of the payout period, the potential benefit of choosing to accept payments over life, life expectancy or life with a term certain had been virtually eliminated. It is highly unlikely that Mr. Madigan would live beyond the guaranteed payment period. There was a much better chance that he would have benefitted had the funds remained with Prudential.

185. Through 12/31/2013 the indexed annuity contracts issued by Bankers Life experienced an ROI of less than 1.5%. That return includes the bonus credited to the account. A well-managed account would have invested the money at a compounded interest rate of at least 5%.

186. No suitability documents are available. There is no writing available showing that Larsen addressed the suitability of the investment.

187. The sales of Bankers Life Annuity 17 and Bankers Life Annuity 18 were part of the ongoing fraudulent scheme to generate commissions by inducing Madigans to dispose or acquire securities and fixed and indexed annuities. The overall scheme included the five Prudential variable insurance products in 2000, two F & G annuities in 2002, two Allianz annuities in 2005, an American Equity annuity in 2007, two

USDC Middle District of Florida Tampa Division       Plaintiff v. Lucci, et al.

Bankers Life annuities in 2008 and the four dispositions of Prudential annuities in 2008 and 2009 and the concomitant acquisitions of other securities, not being annuities.

## Enterprise

188. The members of the association-in-fact enterprise include Lucci, Rucker, Knox and Prudential, all Defendants.

189. Uncharged members of the association-in-fact enterprise include Keller, Tower Equities, High Mark Financial, Sterne Agee Financial Services, Inc. a/k/a SAL Financial Services, Inc. ("SAL"), U.S. Tax Advisory Group, Inc. ("U.S. Tax") and AFS.

190. An association-in-fact enterprise is proven by evidence of an ongoing organization, formal or informal, and that the various associates function as a continuing unit. An association-in-fact enterprise is not defeated merely because there are gaps in its activity or changes in membership.

191. An association-in-fact enterprise must have three structural features: a common purpose, relationships among those associated with the enterprise; and longevity sufficient to permit the associates to pursue the enterprise's purpose.

192. The members of the association-in-fact enterprise shared a common purpose functioning together to sell or facilitate the sales of securities including variable insurance products to Madigans and others employing schemes to defraud, obtaining property by means of misrepresentations of material facts, including

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

omissions to state material facts necessary to make the statements made not
misleading and engaging in practices which operate as fraud.

193. Lucci was the central figure of the enterprise. In connection with the
enterprise, he solicited the sale, arranged the sale, recommended the sale and/or
sold the securities. He participated in each of the 18 predicate acts alleged to have
been committed between 2/7/2000 and 10/16/2009. He continued to provide
brokerage services to Madigans after 10/16/2009 concealing his willful conduct.

194. Prior to 2/7/2000 Lucci was registered with Pruco Securities, Inc. (November
1991 through July 1994), Executive Securities, Inc. (June 1994 through April 1995)
and Tower Equities (March 1996 through November 1997). Lucci worked alongside
Rucker at each of these broker dealers.

195. During the period defined by the predicate acts Lucci was a broker registered
with Tower Equities (November 1999 through December 2000), Sigma (January
2001 through August 2002) and Invest Financial, Inc. (September 2002 through
October 2002) and employed by U.S. Tax (October 2002 through February 2005)
and AFS (February 2005 through November 2009), all broker dealers. Lucci worked
alongside Rucker and Keller at Tower Equities, Rucker at Invest Financial, Inc.,
Rucker at Sigma, Rucker and Knox at SAL and U.S. Tax and Knox at AFS and
Robert Lucci, Inc.

196. While working alongside Rucker and Knox at SAL, Lucci was actually
employed by U.S. Tax, a company not licensed as a broker dealer, for which Lucci
was performing illegal broker dealer services as unregistered person. In July 2003

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

immediately after SAL closed its Sarasota office, Lucci, Rucker and Knox continued

to work from the same address and were employed by U.S. Tax having then

procured a broker dealer license.

197. Additionally, from May 1999 through January 2001, Lucci was President of

High Mark Financial, a company performing insurance agency activities. During this

period Rucker worked for High Mark Financial. From January 1999 through

September 2005 Lucci and Rucker owned MRCL, Inc. Lucci was the President and

Rucker the Vice President. From January 2004 through September 2011 Lucci was

the owner and employee of Robert Lucci, Inc. and Knox was an employee.

198. Lucci was licensed as an insurance agent by Florida and was appointed by

numerous insurance carriers including Prudential, Fidelity & Guaranty, Allianz,

American Equity and Prudential Insurance Company (prior to 2/7/2000).

199. A FINRA check reveals Lucci committed 18 violations involving §517.301

many of which also involve Rucker and Knox.

200. Rucker was an associate of Lucci in the securities business since 1992. Her

business associations with Lucci and others are disclosed above. In addition she

was registered as a broker with AGS from July 1999 through December 1999

working alongside Keller. She was registered as a broker with SAL from October

2002 through July 2003. Rucker was an insurance agent licensed in Florida and

appointed by insurance carriers, including Prudential, Fidelity & Guaranty, Allianz

and Prudential Insurance Company (prior to 2/7/2000). In connection with the

enterprise, she solicited the sale, arranged the sale, recommended the sale and/or

USDC Middle District of Florida Tampa Division                Plaintiff v. Lucci, et al.

sold the securities. She participated in at least 11 of the 18 predicate acts alleged to

have been committed between 2/7/2000 and 10/16/2009. A FINRA check reveals six

violations of §517.301 five of which involve Lucci and Knox.

201. Knox was a broker and investment advisor. Knox first became associated

with Lucci and Rucker in January 2003 when she registered as a broker with SAL.

She worked there until July 2003. From July 2003 through February 2005 she

employed by U.S. Tax as a broker and investment advisor working alongside Rucker

and Lucci. From February 2005 through November 2009 she employed by AFS as a

broker working alongside Lucci. From March 2004 through June 2010 she was

registered with AAM, an affiliate of AFS, as an investment advisor. She contracted

with Madigans to be their investment advisor. In connection with the enterprise, she

solicited the sale, arranged the sale, recommended the sale and/or sold the

securities. Knox participated in at least 8 of the 18 predicate acts alleged to have

been committed between 2/7/2000 and 10/16/2009. A FINRA check reveals two

violations of §517.301 which also involved Lucci and Rucker.

202. Prudential sells insurance products including variable life insurance policies

and variable annuities. Prior to the period defined by the predicate acts Rucker and

Keller were appointed agents for Prudential. During the period defined by the

predicate acts Lucci, Rucker and Keller were appointed agents of Prudential. Lucci

and Rucker were listed as agents of record for the five variable insurance products

purchased by Madigans from Prudential. The appointments of Lucci and Rucker

ended in 2004 but Lucci and Rucker were permitted to continue as agents with

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

respect to variable life insurance products previously sold. Later Rucker in 2005 and
2006 with respect to PVL Policy performed approved agent activities. In 2007 and
2009 Lucci performed approved agent activities.

203. Keller was a broker. She first became associated with Rucker when she
registered with AGS as a broker in September 1999 where she worked through
January 2000. She participated in at least 3 of the 20 predicate acts alleged to have
been committed between 2/7/2000 and 10/16/2009. During the period defined by the
predicate acts, she was registered with Tower Equities as a broker working
alongside Rucker and Lucci. In connection with the enterprise, she arranged the sale
of securities and recommended other actions involving securities.

204. Tower Equities was a broker dealer operating as a branch office of SICOR
Securities, Inc. headquartered in Dayton, OH. Rucker listed Tower Equities as the
broker dealer on the applications attached to the variable insurance products
acquired from Prudential in 2000. As previously stated, Lucci, Rucker and Keller
were registered brokers of Tower Equities.

205. High Mark Financial provided insurance services. Rucker worked for High
Mark Financial. Lucci was the President. Rucker listed High Mark Financial as the
insurance agency on the applications attached to the variable insurance products
acquired from Prudential in 2000. However, at the time of the acquisitions it does not
appear that High Mark Financial was licensed with the Florida Insurance
Department.

USDC Middle District of Florida Tampa Division                Plaintiff v. Lucci, et al.

206. SAL, U.S. Tax and AFS are each uncharged members of the enterprise. SAL was associated with the enterprise as a result of employing Rucker and Knox. U.S. Tax was associated with the enterprise as a result of employing Lucci, Rucker and Knox. AFS was associated with the enterprise as a result of employing Lucci and Knox. Lucci, Rucker and Knox were members of the enterprise participating in the conduct of the enterprise's affairs through a pattern of criminal activity. Under agency principles, including respondeat superior, SAL, U.S. Tax and AFS are each responsible for the acts of its agents acting within his or her scope of authority or employees acting within the course of his or her employment.

207. Notwithstanding the employment of Rucker and Knox, SAL by its own actions associated with the enterprise. On 10/31/2002 SAL, headquartered in Birmingham, Alabama, established a broker dealer branch at 240 S. Pineapple, Sarasota, Florida. The office was closed 7/15/2003. Throughout this period Rucker and Knox were registered as brokers. Lucci worked from the Sarasota office of SAL but was employed by U.S. Tax. Lucci provided brokerage services as an unregistered person as U.S. Tax was not licensed by Florida as a broker dealer.

208. In early 2003 David Simpson, SAL's chief compliance officer, visited the site and discovered that Lucci was providing brokerage services as an unregistered person with the knowledge of Rucker and Knox. He recommended that the office be closed immediately. His reasons for wanting to close the office are not recorded, but it would be a safe bet that he knew U.S. Tax was not licensed as a broker dealer in

USDC Middle District of Florida Tampa Division       Plaintiff v. Lucci, et al.

Florida, Lucci was unlawfully performing brokerage services and the positions into which Lucci was placing his customers were unsuitable.

209. SAL failed to close the office in a timely manner. Between the time of the recommendation and actual closing of SAL's Sarasota office, Lucci committed at least five violations of §517.301 Fla. Stat. involving the sales of worthless hedge fund promissory notes. As SAL knew that Lucci was performing prohibited brokerage services and continued to provide him with an office from which to carry out his illegal activities, SAL directly participated in the conduct of the enterprise. It also concealed the illegal activities from its clients. A FINRA check reveals that Rucker assisted Lucci on all five occasions and Knox assisted Lucci on two occasions. SAL paid all or the majority of the damages awarded to claimants. The cases against SAL and the others were initiated in July 2006.

210. Simpson testified in one of the cases, NASD 06-03057, that SAL's failure to close the office in a timely manner constituted gross negligence and intentional misconduct. Lucci, Rucker and Knox were each ordered to pay $25,000 in compensatory damages. SAL was ordered to pay claimant punitive damages of $100,000.

211. Further, Plaintiff alleges that U.S Tax was an instrument of SAL. After SAL closed its office in July 2003, U.S. Tax having been issued a broker dealer license by Florida stepped right into the shoes of SAL.

- U.S. Tax operated from the same office at 240 S. Pineapple in Sarasota.
- Rucker was President and Lucci and Knox were employees.

USDC Middle District of Florida Tampa Division        Plaintiff v. Lucci, et al.

- The account number for Madigans' U. S. Tax account was the same as the account number for Madigans' SAL account.

- SA Clearing, an affiliate of SAL, provided clearing services for U.S. Tax just as it had for SAL.

212. From 2003 through February 2005 U.S. Tax provided brokerage and insurance services. Lucci and Knox were employed by U.S. Tax throughout this period. Rucker left in late 2004. A FINRA check reveals that Lucci while employed by U.S. Tax committed one other violation of §517.301 Fla. Stat. which also involved the sale of a worthless hedge fund promissory note. During this period none of the predicate acts were committed against Madigans.

213. U.S Tax was owned by John Marshall. A FINRA check of Marshall reveals numerous regulatory violations and customer disputes. He has been suspended twice, censured once and enjoined still another time. He was found liable for theft of customer funds, breach of fiduciary duty, churning and other wrongful acts.

214. In February 2005, after U.S. Tax closed its Sarasota operations, AFS established an unregistered broker dealer branch office in Sarasota. The office was not licensed by Florida until 5/26/2005. On this same date AFS opened offices in Miami and Pembroke Pines. AFS's Sarasota office took over where U.S. Tax left off.

- AFS operated from the same office at 240 S. Pineapple in Sarasota.

- Lucci and Knox were employees.

- SA Clearing, an affiliate of SAL, provided clearing services for AFS just as it had for U.S. Tax.

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

215. While employed by AFS Lucci and Knox committed or participated in the commission of predicate acts 6 to 11 and 14 to 18. Under agency principles, including respondeat superior, AFS, through Lucci and Knox acting within his or her scope of authority, would have indirectly participated in the enterprise's affairs through a pattern of criminal activity.

216. A FINRA check reveals that AFS incurred from heavy fines and significant settlements, some still unpaid, which resulted in ongoing capital shortages violating SEC rules. In December 2009 FINRA for cause terminated AFS's registration. Gautney was stripped of his broker license. The reasons given by FINRA for its actions included the failure of AFS compliance officers to comply with written compliance procedures and failure to supervise broker activity which included widespread churning. On 12/23/2009 Florida terminated the broker dealer license for AFS's Sarasota office. AFS was dissolved in August 2014.

217. Notwithstanding ongoing capital shortages, AFS managed to report net income at the end of each fiscal year through 2007. In 2008, it last full year of operations, AFS's reported a net loss. After reviewing the financial statements released by AFS, questions regarding three items require answers as AFS may have reported a net loss in years 2004 through 2007 and a larger loss in 2008 but for any one of these items.

218. First, from 2005 through 2008 AFS reported average interest income of about $500,000 per year. Yet, its balance sheet shows insufficient invested assets to support such interest income. Gautney reportedly owned Aura Holdings, Inc. ("AH")

USDC Middle District of Florida Tampa Division        Plaintiff v. Lucci, et al.

which owned AAM, an investment advisory firm. Gautney may have consolidated the financial results of AH and AAM with that of AFS. The interest income was actually AAM's net income from investment advisory services.

219. Second, AFS's 2001 through 2008 audited financial statements show an income item, titled "Postage Reimbursement." In years 2004 through 2008 income from postage reimbursement averaged about $500,000. In a June 6, 2009 Administrative Order #SC-2005-0042A issued by the Alabama Securities Commission, an AFS representative in response to a query stated that postage reimbursement was included in the calculation of commissions shown on customer trade confirmations and was intended to reimburse AFS for the distribution of confirmations, monthly statements and other documents. (Actual FedEx and general postage costs incurred by AFS averaged $50,000 per year.) This charge is prohibited unless new clients are made aware of the charge which they were not.

220. SA Clearing was the provider of clearing services to AFS. It would have remitted to AFS an amount representing the commissions shown on the trade confirmation. Confirmations received by Madigans do not show postage reimbursement. Plaintiff can only assume that SA Clearing performed the function per instructions from AFS or AFS performed the function itself.

221. Alternatively, postage reimbursement could also represent a re-conveyance of unused funds from AH to AFS. The financial footnotes provide that AH had contracted with AFS to perform various accounting services including the preparation of payroll. The funds transferred may have exceeded the funds needed

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

to pay for the contracted services. If this was the case the response to the question asked by the Alabama Securities Commission employee was inaccurate.

222. Third, SA Clearing charged AFS clearing fees which declined as a percentage of commissions from 2004 through 2008. The decline was significant. Clearing charges as a percentage of commissions, including the postage reimbursements, fell from approximating 6% in 2004 and 2005, to 3% in 2006 and 2.5% in 2007 and 2008. Total commissions in 2004 were $8.4 million and $6.9 million in 2008.

223. Gautney owned more than 75% of AFS. Gautney provided in statements filed with the SEC that he owned more than 75% of AH which owned 100% of AAM. AH is a holding company but does provide contractual accounting services for AFS for which it is paid dearly. A FINRA check of AFS indicates a change in Gauntney's ownership interest in AH as of 3/2/2009 and that common control of AFS and AH by Gautney may not have taken place until 3/2/2009.

224. In a telephone call made by Plaintiff to SAL, a representative stated that SAL discontinued its relationship with AFS in March 2009; however, Madigans received AFS statements prepared by SA Clearing through October 2009.

### Participated in the Conduct of the Affairs of the Enterprise

225. Lucci conducted or participated in the conduct of the affairs of the enterprise by soliciting the, arranging the sale, recommending the sale and/or selling the securities. He participated in each of the 18 predicate acts alleged to have been committed between 2/7/2000 and 10/16/2009. He continued to provide brokerage

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

services to Madigans after 10/16/2009 concealing his willful conduct. He participated

with other members of the enterprise, including Rucker, Knox, and SAL, in its affairs

through her commission of uncharged criminal activity as revealed in a FINRA

check. He also participated in a conspiracy in violation of §772.103(4) Fla. Stat. to

violate §772.103(3).

226. Lucci illegally performed insurance and brokerage services while on probation

or an unregistered person at least one other member of the enterprise knowingly

assisting him. He participated in the acquisitions of the PVL Policy and PNQ Annuity

2 which replaced other securities and in the purchases of PNQ Annuity 3, PQ

Annuity 4 and PQ Annuity 5 while on probation. He also provided prohibited

brokerage services from the Sarasota office of SAL while employed by U.S. Tax a

company not licensed to provide broker dealer services with the knowledge and

assistance of Rucker, Knox and SAL.

227. Rucker participated in the conduct of the affairs of the enterprise soliciting

the, arranging the sale, recommending the sale and/or selling the securities. She

participated in at least 11 of the 18 predicate acts. She participated in the conduct of

the enterprise's affairs with other members of the enterprise, including Lucci, Knox,

and SAL, through her commission of uncharged criminal activity as revealed in a

FINRA check. She participated in a conspiracy in violation of §772.103(4) Fla. Stat.

to violate §772.103(3).

USDC Middle District of Florida Tampa Division           Plaintiff v. Lucci, et al.

228. In 2000 Rucker knowingly participated with Lucci and Keller in the conduct of the affairs of the enterprise when she assisted Lucci in the sales of Prudential variable insurance products while he was probation.

229. The misconduct disclosed in this paragraph and the following paragraph demonstrates the participation of Rucker and Prudential employees in the conduct the enterprise's affairs. Each application attached to PVL Policy, PNQ Annuity 2 and PNQ Annuity 3 was incomplete. Each failed to provide for investment allocations to the sub-accounts. On 3/16/2000 a member of Prudential's southeast team sent a form, titled Investment Allocations Form, to Rucker requesting that allocations to the sub-accounts be made. The form was sent after PVL Policy, PNQ Annuity 2 and PNQ Annuity 3 had been issued. The last of these contracts issued was PNQ Annuity 3 on 3/2/2000. Rucker filled out the form with allocations. She and Mrs. Madigan signed the form. Rucker falsified the signing date as 2/29/2000. The falsified form was accepted. The initial statements sent Madigans by Prudential for PNQ Annuity 2 and PNQ Annuity 3 confirm that allocations were previously made by Rucker without signed approval. No initial statement is available for PVL Policy. The southeast team sent the form to Rucker to support allocations already made.

230. No applications for PQ Annuity 4 and PQ Annuity 5 are available. Notwithstanding, the allocations shown on the falsified form substantially match the actual allocations on the initial statement received from Prudential for PQ Annuity 4 dated 6/22/2000. Rucker made the allocations without signed approval. The falsified form could not be used to make future allocations for an annuity not yet issued. In

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

any event Mrs. Madigan was not the owner or annuitant of PQ Annuity 4. Mr.

Madigan being the owner and annuitant was required to approve allocations.

Regarding PQ Annuity 5 the initial statement received from Prudential is unavailable.

It would be fraud to sign a document approving allocations prior to the sale of the

annuities.

231. The following illegal act demonstrates the participation of Lucci and Rucker in

the affairs of the enterprise. On 7/6/2000 Rucker filled out and signed an IRS

required form, titled Authorization to Initiate Trustee-to-Trustee Transfers of Certain

Qualified Assets. This form allowed IRA funds maintained at AGS to be transferred

to Prudential followed by the acquisition of PQ Annuity 5. Mrs. Madigan's signature

appears to be forged. Lucci then sent a facsimile to the southeast team attaching the

form. The cover letter is on High Mark Financial letterhead.

232. Knox participated in the conduct of the affairs of the enterprise as a broker

and investment advisor for Madigans. As a fiduciary she failed to provide Madigans

with proper investment advice. Knox participated in at least 8 of the 18 predicate

acts alleged to have been committed between 2/7/2000 and 10/16/2009. A FINRA

check reveals two violations of §517.301 which also involved Lucci and Rucker.

233. Prudential acting through its management and employees participated

directly in the conduct of the enterprise's affairs in the following ways. First,

Prudential used its employees and agents, including other members of the

enterprise, to sell variable annuities to Madigans and other elderly purchasers

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

knowing that the annuities discriminated against purchasers older than 75 years of age at issuance by providing an inferior death benefit.

234. Second, Prudential management failed to properly supervise its employees. Applications for the variable insurance products acquired by Madigans are either incomplete or not available. A Prudential representative informed Plaintiff that unavailable applications do not exist. The applications, if properly filled out and signed, support allocations to the sub-accounts. The agent cannot make allocations without signed approval.

235. Third, Prudential employees sent Rucker a blank investment allocation form on 3/16/2000. The allocations had already been made by Rucker evidenced by initial statements received from Prudential for PNQ Annuity 2 and PNQ Annuity 3 showing that they were made on 2/24/2000 and 3/2/2000, respectively. The southeast team sent the form to support allocation already made without signed approval. Rucker and Mrs. Madigan signed the form. Rucker falsified the form by placing a date of 2/29/2000 next to the signatures. The southeast team accepted the falsified form.

236. Fourth, Prudential employees participated in unsuitable sales of variable insurance products to Madigans. Each variable insurance product acquired was patently unsuitable. The five sales of variable insurance products made up 92% of Madigans' declared net worth. All of the investments in the variable insurance products were invested by Rucker and Lucci with the knowledge of the southeast team in sub-accounts that varied with market performance. These sub-accounts were the riskiest of the risky.

79

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

237. Fifth, upon the recommendations of Lucci and Knox Madigans requested that the annuity starting dates for the variable annuities be extended from 2/1/2038 to a later date. The requests were submitted to Prudential by Lucci and Knox using Lucci's letterhead and faxed from his office. A Prudential officer extended the dates without further consultation with Mr. Madigan to 2/1/2038 and 10/1/2039. The actions resulted in dispositions of the variable annuities and acquisitions of other securities not being annuities.

238. Prudential also participated indirectly in the conduct of the affairs of the enterprise through Lucci and Rucker acting within the scope of their authority. Both were members of the enterprise who participated in the conduct of the affairs of the enterprise.

239. Keller knowingly agreed to facilitate a scheme that would, if completed, constitute a substantive violation involving at least one other conspirator who would participate in the conduct of the enterprise's affairs. She facilitated the acquisitions of PNQ Annuity 3, PQ Annuity 4 and PQ Annuity 5 while Madigans' account executive at AGS.

240. SAL participated in the conduct of the affairs of the enterprise through Rucker and Knox, its own actions and U.S. Tax.

241. U.S Tax participated in the conduct of the affairs of the enterprise through Lucci, Rucker and Knox.

242. AFS participated in the conduct of the affairs of the enterprise through Lucci and Knox.

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

## Pattern of Criminal Activity

243. Section 772.103(3) provides that is unlawful for any person … associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of criminal activity. Section 772.102(4) defines a pattern of criminal activity to include at least two acts of criminal activity the last of which occurred within five years after a prior incident of criminal activity. §772.102(1)(a) defines criminal activity as any crime chargeable by indictment or information under certain provisions including Chapter 517, Security Transactions, and Chapter 817, Fraudulent Practices. However, there is something to a RICO pattern beyond simply the number of predicate acts involved. The criminal activities must be related to one another or the enterprise and exhibit continuity either closed or open.

244. Criminal activity forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.

245. Lucci participated in each of the 18 predicate acts. Sixteen of the 18 predicate acts involved acquisitions and/or purchases of variable insurance products or other securities by Madigans in years 2000 - 2009. The other two predicate acts involved exhorting monies from Madigans in 2005 and 2006 in connection rendering misleading investment advice deceptively convincing them to make additional

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

premium payments on PVL Policy under the guise that the payments were necessary to save the policy when it fact the policy was worthless.

246. Of the 16 predicate acts involving acquisitions and/or purchases of variable life insurance products or other securities, nine of the transactions involved Prudential. The other two predicate acts involved payments being made by Madigans to Prudential. Thus, Prudential participated in 11 of the 18 predicate acts.

247. The last predicate act, the disposition of PQ Annuity 5 and acquisition of Security 11, occurred on 10/16/2009. Lucci, Knox and at least one employee of Prudential participated in the last predicate act.

248. Within the prior five years ten predicate acts occurred. Predicate act 6 was committed 8/12/2005 and predicate act 7 on 6/19/2006. Rucker, Lucci, Knox and Prudential participated in one or more of these acts. Prudential either participated directly through its employees or indirectly through Rucker. Predicate acts 8, 9 and 10 were committed on December 11, 2007 although the effective date for each of the extension was 2/1/2008. Lucci, Knox and employees of Prudential acting within the course of employment participated in the dispositions of PNQ Annuity 2, PNQ Annuity 3 and PQ Annuity 4 and acquisitions of Security 8, Security 9 and Security 10.

249. Predicate acts 14 and 15 were committed on 8/26/2006. Lucci, Rucker and Knox participated in unsuitable purchases of Allianz Annuity 14 and Allianz Annuity 15. Predicate act 16 was committed on 7/13/2007. Lucci and Knox participated in the unsuitable replacement of AE Annuity 16 for F & G Annuity 12. Predicate acts 17

82

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

and 18 were committed on 3/31/2008. (The transfers out of PNQ Annuity 2 and PNQ

Annuity 3 occurred on 3/24/2008.) Lucci and Knox participated in the fraudulent

purchases.

   250. The complete pattern of criminal activity includes predicate acts committed in

2000 and 2002. Predicate 1 was committed on 2/7/2000. Lucci, Rucker and

employees of Prudential participated in the replacement acquisition of PVL Policy.

Predicate 2 was committed on 2/24/2000. Lucci, Rucker and employees of

Prudential participated in the replacement acquisition of PNQ Annuity 2. Predicate 3

was committed on 3/2/2000. Lucci, Rucker, Keller and employees of Prudential

participated in the purchase of PNQ Annuity 3. Predicate 4 was committed on

6/22/2000. Lucci, Rucker, Keller and employees of Prudential participated in the

purchase of PQ Annuity 4. Predicate 5 was committed on 10/16/2000. Lucci,

Rucker, Keller and employees of Prudential participated in the purchase PQ Annuity

5. Predicate 12 was committed on 5/14/2002. Lucci and Rucker participated in the

purchase of F & G Annuity 12. Predicate 13 was committed on 6/27/2002. Lucci and

Rucker participated in the purchase of F & G Annuity 13.

   251. The predicate acts are also related to the affairs of the enterprise. It was only

through the enterprise consisting of Lucci and Rucker and then Lucci, Rucker and

Keller that the acquisitions of the five Prudential variable life insurance products

could occur. Lucci was serving probation at the time. Prudential and its Southeast

Team knowingly used the enterprise to sell variable annuities that offered inferior

death benefits to purchasers older than 75 years if age at issuance. It could then

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

gather with associates who were bent on selling unsuitable annuities to the elderly. By design those sales could, and did, lead to extensions in later years allowing Prudential to manage the funds longer and collect commissions and fees, including excessive insurance fees, it would not otherwise receive.

252. A FINRA check revealed that prior to 2/7/2000 (date of first predicate act) Lucci committed 12 violations, all involving §517.301 Fla. Stat. and 11 involving misrepresentations in the sale of variable annuities contracts or variable life insurance policies. Most of these violations were committed while Rucker was working at the same brokerage firm with Lucci.

253. The FINRA check also revealed that after 2/6/2000 Lucci committed seven other violations of §517.301. At the time of these violations he was registered with Tower Equities (registered in September 1999 while on probation) or employed by U.S. Tax. One of the violations involved the sale of a variable annuity with assistance of Rucker. The others involved sales of worthless hedge fund promissory notes.

254. A FINRA check revealed that Rucker committed six violations of §517.30. In May 2000, while registered with Tower Equities, Rucker signed as agent on the sale of an unsuitable variable annuity solicited by Lucci. In April 2003, while registered with SAL, Rucker assisted Lucci in five separate sales of worthless hedge fund promissory notes. Knox assisted Lucci in two of these sales. Lucci was employed by U.S. Tax, an unlicensed broker dealer, for which he performed prohibited brokerage services as an unregistered person from the Sarasota office of SAL.

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

255. A FINRA check revealed Knox committed two violations of §517.301. Refer to the paragraph above.

256. An internet search revealed that Prudential and related companies committed violations of the security laws. Many of the violations included variable life insurance products. In 1996 Prudential Insurance Co. paid $35 million in a multi-state settlement, a record at the time, and agreed to make restitution to customers who were misled by agents in the sale of variable insurance products. The company in 1997 set aside $2.6 billion to pay claims.

257. On 7/8/1999 NASD levied a $20 million fine against Prudential Insurance Co. for deceptive sales practices in variable annuity products. The fine was part of an ongoing class action law suit that charged the company with misleading customers. NASD found that over 200,000 variable life insurance policies sold violated NASD rules and federal securities laws. Abuses included deceptive sales practices involving exchanges of policies, unsuitable recommendations, incomplete or no applications, failing to establish and maintain proper supervisory procedures for its agents and allowing unlicensed agents to sell its insurance. It was also fined $1 million for destroying documents associated with the sales of variable life insurance products.

258. During the period beginning in late 1998 through 2003 Prudential failed to disclose that American Skandia Investment Services, Inc. ("ASISI") had been violating Section 206(2) of the Investors Advisors Act of 1940 by accommodating widespread market timing in Prudential sub-accounts that serve as funding vehicles

USDC Middle District of Florida Tampa Division                    Plaintiff v. Lucci, et al.

for variable annuities issued by Prudential. ASISI was a wholly owned subsidiary of

Prudential providing captive investment advice to Prudential. In 2009 ASISI was

required to pay $34 million in fines to the SEC and $34 to owners of variable

annuities.

   259. In 2001 NASD fined Prudential Insurance Co. $10,000 for improper marketing

of variable annuities.

   260. On 12/21/2002, Prudential Financial, Inc. settled a lawsuit alleging it had

charged blacks more than whites for some life insurance products.

   261. On 1/29/2004 the SEC announced that Prudential Securities, Inc. had failed

to properly supervise the replacement of other variable annuities with its variable

annuities. A fine of $2 million was assessed and it was ordered to pay $9.5 million in

restitution.

   262. On 2/17/2007 NASD announced that Prudential Insurance Co. had

accommodated the manipulation of its variable sub-accounts by allowing purchasers

of its variable annuities to enter into a widespread market timing scheme.

   263. Regarding continuity, Madigans are alleging RICO violations over a closed

period extending from 2/7/2000 through 10/16/2009. Within this period 18 predicate

acts are alleged to have been committed. In addition, the members of the enterprise

committed other uncharged but related acts. Within the closed period Madigans

were threatened with continuing criminal conduct.

   264. Lucci performed brokerage services for Madigans throughout the period

defined by the predicate acts. Lucci continued to provide brokerage services through

86

April 2013. He occupied a fiduciary position with respect to Madigans through the periods.

265. Knox performed brokerage services, investment advisor services, for Madigans from January 2003 through 10/16/2009. She continued to provide investment advisor services through the 2010. He occupied a fiduciary position with respect to Madigans through the periods.

266. Prudential participated in the predicate acts throughout the period defined by the predicate acts. Prudential sold annuities that provided inferior death benefits until May 2007 when it issued a prospectus in which it provided that annuities of the type Madigans purchased would no longer be sold to purchasers over 75 years of age at issuance. Prudential failed to supervise its employees and agents. This failure existed up to and including 10/16/2009 when corporate officers, no less, attempted to extend the annuity starting date for a qualified annuity to an unrealistic date in contravention of its own announcement in a prospectus. The announcement warned against setting unrealistic dates. As a result the annuities Madigans own are being assessed excessive insurance fees. They are assessing a charge for a risk that does not exist. On 2/29/2000 Rucker filled out Prudential's investment allocation form received from the Southeast Team. She signed the form. She had Mrs. Madigan sign the form. Mrs. Madigan had no authority to sign for Mr. Madigan. It appears as though the allocations applied to future purchases of annuities. This practice may continue. An internet search produced a multitude of violations involving annuities.

267. Prudential has failed to pay "required minimum distributions" since 10/16/2009. These failures have caused Madigans to incur and pay IRS penalties. These failures demonstrate a continuing threat of criminal conduct under §817.29 Fla. Stat.

268. The predicate acts and uncharged acts demonstrate a threat of continuing criminal activity after 10/16/2009 extending indefinitely into the future. The predicates are a regular way of Prudential conducting its ongoing legitimate business. The predicates and uncharged acts are a regular way of Lucci, Rucker and Knox conducting his or her own ongoing legitimate business. Lucci and Rucker are licensed to solicit and sell insurance products in Florida and appointed by insurance carriers.

<h3 style="text-align:center">Through a Pattern of Criminal Activity</h3>

269. Lucci, Rucker, Knox and Prudential all Defendants and Keller conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of criminal activity. The criminal activity committed was related to the enterprise as a defendant's membership in the enterprise enabled or facilitated his or her commission of the criminal acts. The members of the association-in-fact enterprise shared a common purpose functioning together to sell or facilitate the sales of securities including variable insurance products to Madigans and others employing schemes to defraud, obtaining property by means of misrepresentations of material facts, including omissions to state material facts necessary to make the statements made not misleading and engaging in practices which operate as fraud.

The enterprise included members with like minds. Membership in the enterprise enabled each defendant to commit his criminal acts.

270. Lucci solicited and sold securities, including variable life insurance products, to the elderly and others in a direct manner. He recommended actions be taken with respect to securities that would result in or lead to dispositions and purchases of securities in an indirect manner. He also provided misleading investment advice to exhort monies from clients. Lucci had to act through an enterprise that included others members of like mind. His resume of past violations dictated that. When Lucci was serving probation Rucker and Keller had to step into the gap. When providing prohibited brokerage services while employed by U.S. Tax, Rucker and Knox had to step into the gap.

271. Rucker, Keller and Knox participated in the conduct of the affairs of the enterprise through patterns of criminal activity. Each chose to participate in the enterprise by assisting Lucci and each other through a pattern of criminal activity. They had a common goal, to share in the profits which could only be recognized if they were members of the enterprise.

272. Prudential participated both directly and indirectly in the conduct of the affairs of the enterprise through a pattern of criminal activity. Prudential used the enterprise to sell variable insurance products that were unsuitable to the needs of Madigans and others. It also participated indirectly in the conduct of the affairs of the enterprise through a pattern of criminal activity, that is, through Rucker, Lucci and Knox.

USDC Middle District of Florida Tampa Division          Plaintiff v. Lucci, et al.

### Conspiracy

273. Section 772.103(4) Fla. Stat. makes it a crime to conspire to violate any of the substantive provisions of §772.103(1), (2) and (3) Fla. Stat.

274. Lucci, Rucker, Knox and Prudential all Defendants and Keller were co-conspirators in a conspiracy to defraud purchasers in the acquisition of securities. A conspiratorial agreement to violate RICO may be established upon a showing that a person either agrees to personally commit two predicate acts or agrees to participate in the conduct of the enterprise with the knowledge that other members of the conspiracy would commit at least two predicate acts in furtherance of the enterprise. In fact a person who does participate in the conduct of the enterprise may violate §772.103(4) although that person is not in violation of §772.103(3). If a person knowingly facilitates a scheme that would, if completed, constitute a substantive violation of RICO involving at least one conspirator who conducts or participates in the conduct of the affairs the enterprise.

275. It is not necessary that a conspirator explicitly agreed with every other conspirator to commit the RICO violation, knew his fellow co-conspirators or was aware of all details of the conspiracy. It is only necessary that a defendant knew the general nature of the conspiracy and that it extends beyond his or her individual role. Because conspirators attempt to conceal their conduct, the elements of a conspiracy can be proven by circumstantial evidence showing that defendant must have known that others were conspiring to participate in the same enterprise through a pattern of

90